Leonid **PETKIEWYTSCH**, Petitioner,

v.

**IMMIGRATION AND NATURALIZATION SERVICE,** Respondent.

No. 90–3952.

United States Court of Appeals, Sixth Circuit.

Argued July 25, 1991.

Decided Sept. 30, 1991.

■■■■■■■■■■■■■■■■■■■■

Douglas S. Weigle (argued and briefed), Bartlett, Junewick & Weigle, Cincinnati, Ohio, for petitioner.

Nicholas J. Pantel, Asst. U.S. Atty., D. Michael Crites, U.S. Atty., Cincinnati, Ohio, Robert Kendall, Jr., U.S. Dept. of Justice, Civ. Div., Washington, D.C., Bruce J. Einhorn, Dept. of Justice, Washington, D.C., Robert L. Phillips, Office of I.N.S., Cincinnati, Ohio, Joni S. Charme, Denise Noonan Slavin, Susan L. Siegal (argued and briefed), U.S. Dept. of Justice, Office of Special Investigations, Washington, D.C., for respondent.

Before MERRITT, Chief Judge, LIVELY, Senior Circuit Judge, and HULL, Chief District Judge.*

LIVELY, Senior Circuit Judge.

The question in this case is whether a permanent resident alien who served involuntarily as a civilian guard in a German "labor education camp" during the period of Nazi control and who never personally abused prisoners is subject to deportation under the Immigration and Nationality Act of 1952, as amended, (the Act), 8 U.S.C. § 1101, et seq. More specifically, the question arises under section 241(a)(19) of the Act, 8 U.S.C. § 1251(a)(19) (the Holtzman Amendment). The Holtzman Amendment was enacted in 1978; section 103 provides for the deportation of any alien who, under the direction of or in association with the Nazi government of Germany, ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion between March 23, 1933 and May 8, 1945. Holtzman Amendment § 103, Pub.L. No. 95–549, 92 Stat. 2065, codified at 8 U.S.C. § 1251(a)(19).

I.

The facts relating specifically to the petitioner's background and conduct are not disputed by the parties and consistent factual determinations were made by the immigration judge and the Board of Immigration Appeals (the Board).

A.

The petitioner is a 67 year old married male and a native of Poland. The petitioner lived in Poland under Nazi occupation until 1944. In 1944, petitioner, then age 21, fled with his family from Poland to Czechoslovakia to avoid the consequences of battle and occupation by the approaching Russian army. From Czechoslovakia, the petitioner and his family were sent with other refugees to a transit camp in Austria. After arriving in Austria, the family was ordered by the Germans to report to the labor exchange in Kiel, Germany. At Kiel, the family was separated. The petitioner's parents were assigned to a local fish cannery while the petitioner and his twin brother were ordered to report to the Kiel–Hasse labor education camp to serve as civilian guards. The petitioner and his twin brother objected to the assignment but nevertheless reported for duty. Refusing the assignment would have subjected the petitioner to imprisonment or execution.

After reporting to the camp, the petitioner, though serving as a *civilian* guard, was issued a used uniform of a Gestapo SS member and given a rifle with five rounds of ammunition. The petitioner was instructed on how to escort prisoners to and from work sites and how to clean and load his rifle. His guard duties required him to act as a perimeter guard, to escort prisoners to work sites and, on a rotating basis, to stand guard at the entrance to a bunker where prisoners were interrogated and sometimes mistreated. The petitioner's primary responsibility was to prevent the escape of prisoners and he was under or-

* The Honorable Thomas G. Hull, United States District Chief Judge for the Eastern District of Tennessee, sitting by designation.

ders to shoot anyone attempting to escape. When not on duty, the petitioner was allowed unescorted liberty outside the camp which he used to visit his family. The petitioner was informed that he would be imprisoned or shot if he disobeyed orders or attempted to run away.

While serving as a civilian guard, the petitioner witnessed frequent mistreatment of prisoners and was aware that some executions took place. However, during his eight-month service as a civilian guard the petitioner never used his rifle, never struck a prisoner and never personally inflicted any form of abuse upon prisoners beyond impeding their escape through his presence as a civilian guard.

At the war's conclusion, the petitioner and his twin brother sought work at local farms. They were quickly apprehended by the British, however, and interned for thirty-four months as suspected war criminals. After his internment, the petitioner was released by the British under "category 5," which meant that he was totally exonerated of any wrongdoing and of all charges against him. In March 1948, the petitioner applied to the Preparatory Commission of the International Refugee Organization to receive benefits as a refugee, which would have certified him for entrance into the United States under the Displaced Persons Act of 1948 (DPA), Pub.L. No. 80–774, ch. 647, 62 Stat. 1009 (1948), as amended, June 16, 1950, Pub.L. No. 81–555, ch. 262, 64 Stat. 219 (1950). However, part II of annex I to the Constitution of the International Refugee Organization (IRO), which was incorporated by reference into the DPA as enacted in 1948, denied benefits to anyone who could be shown "to have assisted the enemy in persecuting civil populations...." IRO Constitution, annex I, part II § 2(a); DPA § 2(b). The petitioner was denied assistance from the IRO because he had served as a guard at the labor education camp. In 1955, the petitioner applied to the United States Consulate in Hamburg, Germany for an immigration visa under the Immigration and Nationality Act, which then contained no provision denying admission to those who had participated or assisted in Nazi persecutions. On March 9, 1955, the petitioner was issued an immigration visa under the Act by the American Consulate in Hamburg, Germany, and has lived in the United States as a permanent resident since 1955.

B.

The administrative record contains expert testimony regarding the system of camps established by the Nazi regime, their purposes and their organizational control. The most repressive Nazi camps came under the direction the German SS, the organization established by Hitler to suppress groups targeted on the basis of race, religion and national origin. Concentration camps were established prior to the war in order to intimidate and torture those targeted groups perceived as impeding Nazi goals. Concentration camps were used by the SS as permanent institutions of the state and were designed as intimidation instruments for political dissenters, opposition groups and groups in society that the Nazi regime determined to be unworthy of full citizenship. These camps contained many permanent buildings, heavily concentrated inmates and were surrounded with electric wire carrying a lethal charge.

After the outbreak of war, sub-camps of the concentration camps emerged, also controlled by the German SS, which became known as the extermination camps. Consisting of gas chambers, railroad sidings and very little else, extermination camps such as Auschwitz, Treblinka and Buchenwald were intended and used solely to eliminate Jews and other groups of people deemed inferior by the Nazis.

Forced labor camps were another sub-component of concentration camps, also primarily under the control of the German SS. Forced labor camps were temporary out-camps typically set up near concentration camps or near a particular work site to permit exploitation of the labor available from the concentration camp for economic purposes. These camps were also fenced, but much less extensively than concentration camps, and the fencing typically did not contain a lethal charge.

This appeal involves a labor education camp. Labor education camps were initially created as repositories for foreign laborers involuntarily deported into Germany to fill the acute labor shortage created by the massive mobilization for war. However, the labor education camps also quickly became used as punishment camps for workers accused of slacking, other labor infractions or other generalized violations of state policy, such as sexual contact with German nationals, minor crimes, practicing religion in a language other than German or failing to wear a special badge designating one as Jewish or Polish. Labor education camps involved much less security than other camps and typically involved sentences of relatively short duration.

At the Kiel–Hasse labor education camp there was no fence nor any other feature of a concentration or extermination camp and the normal period of incarceration was fifty-six days. Physical abuses, malnutrition and overcrowded conditions were nevertheless prevalent and former inmates testified to interrogations, torture and executions. Expert witnesses testified that documents from Kiel–Hasse revealed that guards were prohibited from beating prisoners at Kiel–Hasse. These witnesses expressed the opinion that the inmates experienced persecution primarily at the hand of SS guards present at the camp and more senior Gestapo officials rather than at the hand of civilian guards such as the petitioner.

## II.

In July 1985 the United States Immigration and Naturalization Service (INS) issued an Order to Show Cause charging that the petitioner was deportable, among other provisions, under section 103 of the Holtzman Amendment, for assisting or otherwise participating in Nazi persecution. The petitioner denied the allegations in the show cause order material to deportation under the Holtzman Amendment. In April 1986 an eight-day evidentiary hearing was held before an immigration law judge on the issue of deportability. During the hearing the testimony of numerous witnesses was admitted, including historians with expertise in the operation of Nazi camps, former inmates of Kiel–Hasse, government officials and family members of the petitioner.

In March 1987 the immigration judge issued a brief opinion that ordered the deportation proceedings against the petitioner terminated. The immigration judge found that the petitioner had not personally engaged in any persecutorial acts and that the petitioner's "wrongful conduct, at most, was his acceptance under duress of his duties as a civilian labor education camp guard." Noting the petitioner's young age at the relevant time period, the immigration judge concluded that the petitioner "was equally a victim of the times that he lived in. . . ." The government appealed the immigration judge's opinion to the Board.

The Board rendered a decision in May 1990 reversing the decision of the immigration judge and ordering deportation. After a thorough review of the evidence, the Board agreed with the factual findings deemed critical by the immigration judge that the petitioner's service as a civilian guard was involuntary and that the petitioner had not personally engaged in any acts of abuse. The Board in fact described the petitioner as "a rather reluctant guard who performed his duties as ordered in order to escape imprisonment or death." Unlike the immigration judge, however, the Board found these factual determinations to be without legal relevance in applying the Holtzman Amendment. The Board concluded that only the "objective *effect*" of the petitioner's conduct controlled (emphasis in original) and that the "objective effect" of his service as a civilian guard was to assist the Nazis in their persecution of those within Kiel–Hasse by preventing their escape.

The Board found the key issue presented by the case to be whether Kiel–Hasse was a place where persecution occurred due to race, nationality, religion or political opinion, as is required for deportation under the Holtzman Amendment. After reviewing the policies served by the labor edu-

cation camps and the practice of using the camps as an enforcement mechanism to carry out labor decrees directed against foreign workers deemed politically suspect, racially unreliable or of an inferior national origin, the Board concluded that Kiel–Hasse was a repository for the persecution of people based on race, nationality and political opinion. The Board further found that persecution took place in Kiel–Hasse, not only by the fact of involuntary confinement, but also by deprivation, torture and executions. The Board thus concluded that the petitioner was deportable under the Holtzman Amendment because of his duties as a guard at a camp where persons were persecuted based upon race, religion, national origin or political opinion.

### III.

■ The petitioner has challenged the factual finding of the Board that Kiel–Hasse was a place of persecution based upon race, religion, national origin or political opinion. However, the record contains evidence of deprivations, torture and executions at Kiel–Hasse that leaves no question but that it was a place of persecution. Additionally, petitioner's contention that internment at Kiel–Hasse required the commission of an act by the inmate, and thus that the persecution in the camp was based upon an infraction rather than upon race, religion or national origin is unpersuasive. While German nationals were not immune from labor education camp imprisonment for genuine labor violations, the record clearly demonstrates that the "infractions" resulting in labor education camp imprisonment were predominantly based upon race and nationality, such as the refusal of Jews, Poles or other eastern workers to wear the insignia assigned to them on their clothing. Persecution stemming from such "infractions" must, therefore, be considered to be based on race, religion, national origin or political opinion. We agree with the Board's decision in this regard.

### IV.

This brings us to the principal issue presented by this appeal: Whether the Board correctly construed the Holtzman Amendment to require the deportation of one who involuntarily served as a labor education camp civilian guard to avoid imprisonment or death and who never personally committed any acts of abuse against prisoners.

The Holtzman Amendment was added to the Act in 1978. Section 103 of the amendment provides, in pertinent part:

Any alien in the United States ... shall, upon the order of the Attorney General, be deported who—

\* \* \*. \* \* \*

(19) during the period beginning on March 23, 1933, and ending on May 8, 1945, under the direction of, or in association with—

(A) the Nazi government of Germany,

(B) any government in any area occupied by the military forces of the Nazi government of Germany,

(C) any government established with the assistance or cooperation of the Nazi government of Germany, or

(D) any government which was an ally of the Nazi government of Germany,

ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion; ...

8 U.S.C. § 1251(a)(19).

### A.

Whether § 1251(a)(19) requires the result reached by the Board is clearly a question of statutory construction. The standard of review applicable to questions of statutory construction was stated by the Supreme Court in *INS v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987): " 'The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. [Citing cases.] If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.' " *Id.* at 447–48, 107 S.Ct. at 1221 (quoting *U.S.A.*

*Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984)). We discuss briefly the development of the relevant legislation as a background to our more specific treatment of the issue before the court.

### B.

Congress passed the DPA in 1948 as a means of temporarily eliminating restrictive immigration quotas and providing relief to the vast numbers of persons displaced by the ravages of World War II by permitting their entrance into the United States for permanent residence. As initially enacted, the DPA expressly prohibited the issuance of a visa "to any person who is or has been a member of, or participated in, any movement which is or has been hostile to the United States or the form of government of the United States." DPA § 13, Pub.L. No. 80–774, ch. 647, 62 Stat. 1009, 1014 (1948). In addition, § 2(b) of the DPA limited the application of the DPA to those "who [were] the concern of the International Refugee Organization" under the terms of that organization's constitution. Congress thus incorporated by reference the provision of annex I, part II of the IRO Constitution which listed the categories of persons who were not of concern to the IRO. Such persons were described in the IRO Constitution as follows:

> 2. Any other persons who can be shown:
>
> (a) to have assisted the enemy in persecuting civil populations of countries, Members of the United Nations; or
>
> (b) to have voluntarily assisted the enemy forces since the outbreak of the Second World War in their operations against the United Nations.[1]
> IRO Constitution, Chapter XXIX, annex I, part II, § 2(a) & (b) (footnote in original).

Congress subsequently amended § 13 of the DPA in 1950 to prohibit issuance of a visa to any person who advocated or assisted in the persecution of any person because of race, religion, or national origin...." June 16, 1950 Amendment to DPA, Pub.L. No. 81–555, ch. 262, 64 Stat. 219, 227 (1950). Thus, as enacted in 1948 and as amended in 1950, the DPA effectively blocked immigration to the United States of those who assisted in persecution.

The Immigration and Nationality Act as adopted in 1952 did not proscribe issuance of visas to those who had assisted in persecution during the war. Section 340(a) of the Act, 8 U.S.C. § 1451(a), did provide authority to denaturalize and revoke the citizenship of one who gained admission to the United States either illegally, by concealment of a material fact, or by willful misrepresentation. Thus, one who entered the United States under the DPA by concealing assistance or participation in persecution remained subject to deportation under § 340(a) of the Act. However, because the Act contained no restrictive provision similar to the DPA, a person who assisted in persecution but who entered the United States pursuant to the Act legally and without concealment or misrepresentation was not subject to deportation under § 340(a).

This loophole in the Act was remedied by section 103 of the 1978 Holtzman Amendment which added to the permanent immigration laws of the United States a provision for the deportation of aliens who participated in Nazi-directed persecution of individuals "because of" race, religion, national origin or political opinion. The Holtzman Amendment thus provided an independent basis for deporting immigrants who entered the United States lawfully despite their participation or assistance in persecution of civilians during the war.

### C.

Although the parties briefed the case extensively and argued it fully, their positions can be stated rather succinctly. The petitioner contends that this is a case of first impression because no court has decid-

---

1. Mere continuance of normal and peaceful duties, not performed with the specific purpose of aiding the enemy against the Allies or against the civil population of territory in enemy occupation shall not be considered to constitute "voluntary assistance".

ed that a resident alien who has been found to have served involuntarily as a guard in a labor education camp is deportable under the Holtzman Amendment. He argues that these two factors—involuntariness and guard duty in the least restrictive type of Nazi detention camp—demonstrate that he was not a war criminal. The legislative history of the Holtzman Amendment makes it clear, he asserts, that it was not intended to apply to a person with his wartime record.

The government responds that neither of the factors cited by the petitioner makes any difference. The cases, particularly *Fedorenko v. United States*, 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981), make it clear, according to the government, that the petitioner is deportable because Kiel–Hasse was a "place of persecution" and the petitioner assisted in the persecution of individuals "because of race, religion, national origin, or political opinion." It is enough, the government argues, that the petitioner wore a uniform and carried a loaded weapon and his job was to prevent the escape of those confined and subject to persecution.

It is clear that the case is unique in at least one respect: the immigration judge and the Board agreed that the petitioner acted involuntarily and that the record contains no evidence that the petitioner personally abused or mistreated any inmate. Many of the cases we have examined contained sharply conflicting evidence of the alien's personal participation in persecution, and deportability often turned on a court's resolution of such evidence. Here, although a number of former inmates of Kiel–Hasse testified, none was able to relate an incident in which the petitioner abused anyone.

## V.

The Holtzman Amendment, although an independent legislative act, was designed to "establish within the permanent U.S. immigration law a provision which ... appeared previously in [the DPA]." H.R.Rep. No. 95–1452, 95th Cong., 2d Sess. at 3, *reprinted in* 1978 U.S.Code Cong. & Ad-

min.News 4700, 4702. Thus, our starting point is the Supreme Court's construction of the DPA in *Fedorenko*. We then examine decisions applying the teachings of *Fedorenko* to cases under the Holtzman Amendment.

## A.

*Fedorenko* involved denaturalization proceedings against Feodor Fedorenko. Fedorenko gained permanent admission to the United States in 1949 under the 1948 DPA. During the war, Fedorenko, who was a Ukranian, served in the Russian army. He was captured by the Germans and required to serve as an armed guard at the Nazi extermination camp, Treblinka. 449 U.S. at 494, 101 S.Ct. at 741. Fedorenko denied personal involvement in the atrocities at Treblinka, but admitted that he followed orders by shooting in the general direction of escaping inmates during an uprising. *Id.* at 500, 101 S.Ct. at 744. In his application for a visa under the DPA, Fedorenko deliberately concealed his service as a guard at Treblinka. *Id.* at 496, 101 S.Ct. at 741–42. In 1969 Fedorenko applied for citizenship, again concealing his service at Treblinka, and became a United States Citizen. *Id.* at 497, 101 S.Ct. at 742. Arguing that his service at Treblinka constituted "assist[ance] [to] the enemy in persecuting civil populations" under the 1948 DPA, the government instituted a denaturalization action against Fedorenko in 1976 under section 340(a) of the Act, 8 U.S.C. § 1451(a) for concealment of material evidence.

The Supreme Court held that Fedorenko's involuntary service as an armed guard at Treblinka disqualified him as a matter of law from admission to the United States under the DPA. *Id.* at 514, 101 S.Ct. at 751. In so ruling, the Supreme Court specifically rejected the argument that the DPA required the conduct constituting assistance in persecution to be voluntary. *Id.* at 512, 101 S.Ct. at 750. In place of interpreting the DPA to include a voluntariness requirement, the Supreme Court directed lower courts to focus "on whether particular conduct can be considered assisting the *persecution* of civilians." *Id.* at n. 34 (em-

phasis in original). The Supreme Court offered some assistance to lower courts in making this difficult determination by describing a continuum of conduct:

> Thus, an individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders from the commandant of the camp, fits within the statutory language about persons who assisted in the persecution of civilians.

*Id.* Having described the continuum, the Court noted that "[o]ther cases may present more difficult line-drawing problems...." *Id.*

### B.

The "line drawing" in cases under the Holtzman Amendment has been particularly difficult and has produced conflicting results. In *Schellong v. INS*, 805 F.2d 655 (7th Cir.1986), *cert. denied*, 481 U.S. 1004, 107 S.Ct. 1624, 95 L.Ed.2d 199 (1987), the court of appeals applied the Holtzman Amendment to affirm the deportation of a person who voluntarily joined a special commando unit of the Nazi SS and served as an armed guard at two concentration camps. *Id.* at 656–57. There was no evidence, however, that Schellong personally engaged in physical abuse of prisoners while serving as a guard. *Id.* at 657. The court noted that it had previously held in *United States v. Kairys*, 782 F.2d 1374 (7th Cir.), *cert. denied*, 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986), that service as a guard at a concentration camp equaled persecution under the DPA without proof of personal involvement in atrocities. *Id.* at 660. Concluding that the purposes of the two statutes were identical, the court found that proof of Shellong's service as a guard at a concentration camp established that he had "assisted in persecution for purposes of Section 1251(a)(19)"

and therefore was deportable. *Id.* at 661. The court specifically rejected the argument that an individual must have actively or personally participated in persecution to be deportable under the Holtzman Amendment as inconsistent with *Fedorenko*. *Id.* This holding was reaffirmed in *Kulle v. INS*, 825 F.2d 1188 (7th Cir.1987), *cert. denied*, 484 U.S. 1042, 108 S.Ct. 773, 98 L.Ed.2d 860 (1988).

Another court reached a different conclusion in *Laipenieks v. INS*, 750 F.2d 1427 (9th Cir.1985), a deportation proceeding under the Holtzman Amendment against a native of Latvia. The petitioner had served voluntarily as a member of the Latvian Political Police, an organization formed to investigate and arrest individuals who participated in Soviet atrocities against Latvian citizens during the period of Soviet domination which preceded Nazi occupation. *Id.* at 1429. Although Laipenieks admitted slapping Soviet sympathizers taken as prisoners, the court of appeals found that the INS failed to establish by clear and convincing evidence that Laipenieks' individual conduct had been motivated by the political opinion of the prisoners. Relying on the legislative history of the Holtzman Amendment, the court held that deportability under § 1251(a)(19) "may only be sustained when the evidence establishes that the individual in question *personally* ordered, incited, assisted, or otherwise participated in the persecution of individuals." *Id.* at 1431 (emphasis added). Relying on note 34 in *Fedorenko* and the legislative history of the Holtzman Amendment, the court concluded that the proper analysis under the Holtzman Amendment was whether there was "proof of *personal active assistance* or participation in persecutorial acts...." *Id.* at 1432 (emphasis added).

On the other hand, the court in *Maikovskis v. INS*, 773 F.2d 435 (2d Cir.1985), *cert. denied*, 476 U.S. 1182, 106 S.Ct. 2915, 91 L.Ed.2d 544 (1986), found that personal motivation was immaterial. Maikovskis's application for admission to the United States under the 1948 DPA concealed his voluntary service as the Chief of Police in a Nazi-dominated precinct in Latvia. *Id.* at

438. In response to the death of two Latvian police officers at the hands of Soviet partisans in the village of Audrini, Maikovskis ordered his Latvian police to join with German soldiers in arresting all of the Audrini villagers, approximately 200–300 persons, and in burning the village to the ground. *Id.* Maikovskis denied involvement in the subsequent executions and murder of almost all of the villagers. *Id.* Nevertheless, his personal participation in the persecution of civilians was clearly established. Maikovskis argued, however, that the government had failed to produce evidence that his conduct was *personally* motivated by the villager's political opinion. *Id.* at 445. Citing to the language, purpose and legislative history of the Holtzman Amendment, the court of appeals held that the personal motivation of the alien for assisting in persecution is immaterial when it is shown that the Nazi persecution in which the alien participated took place because of race, religion, national origin or political opinion. *Id.* at 445–46.

## VI.

■ Although the Holtzman Amendment was designed to fill a loophole in the permanent immigration law and its language is similar to that found in the DPA, the legislative history indicates an intention, at least in part, to accomplish a different purpose. The DPA was designed to provide relief to the multitude of displaced persons and refugees in Europe after the end of World War II. The problem was one of immense proportions and there was need for immediate action. These factors doubtless account for the absence of any legislative history addressing the provision in the 1948 DPA excluding persons who had assisted in persecution and for the decision merely to incorporate portions of the IRO constitution. Thirty years later, when the Holtzman Amendment was adopted, it had become clear that some war criminals, actual perpetrators of the Holocaust and other war crimes, had entered this country under the 1952 Act. The Holtzman Amendment provided the basis for their deportation.

### A.

The Holtzman Amendment's legislative history contains a clear and repetitive message that the amendment was intended to deny "sanctuary in the United States to Nazi *war criminals*" 124 Cong.Rec. 31,647 (1978) (statement of Rep. Holtzman) (emphasis added), and that the "bill applies to any person who committed *war crimes* under the Nazis...." *Id.* at 31,649 (emphasis added). The specific discussion on the House floor in which Representative Holtzman explained the purpose and scope of the bill demonstrates that the focus of the bill's intent centers on Nazi war criminals. Indeed, reference to "Nazi war criminals" or "war criminals" is made no less than nineteen times during the short discussion in which the purpose and reach of the bill is explained. See 134 Cong.Rec. 31,646–50 (1978). At one point Representative Holtzman explained the bill as follows: "The bill as reported here contains an amendment that limits the language of the bill *solely to those persons who engaged in war crimes....*" 134 Cong.Rec. 31,647 (1978) (emphasis added). Again she stated, "[T]he bill is intended to cover *active participation* and not mere acquiescence by the population as a whole." *Id.* at 31,649 (emphasis added). Representative Holtzman was joined in explaining the bill by another subcommittee member, Representative Eilberg, who stated the bill's purpose:

> Mr. EILBERG. [T]he purpose of this bill, which is cosponsored by all of the members of the Subcommittee on Immigration, Citizenship and International Law, is to prevent the entry into, as well as facilitate the deportation from the United States of *aliens who have engaged in persecution* based on race, religion, national origin or political opinion under the Nazis.

*Id.* at 31,647 (emphasis added). Mr. Eilberg and Ms. Holtzman each went on to make several additional references regarding the bill's applications to those who *engaged* in war atrocities. *Id.* at 31,647–48. Representative Eilberg also stated:

[T]hat dreadful period in the history of mankind should forever serve as a tragic reminder to all civilized people of the terrible extremes to which an entire nation can be led by a small but highly organized group of demented and *ruthless leaders.* This bill addresses itself to the *members of that group—to the perpetrators* of the "Holocaust."

*Id.* at 31,647 (emphasis added).

We appreciate the fact that statements in floor debate often do not truly reflect the purpose of an act of Congress. Nevertheless, this bill was the work of Representative Elizabeth Holtzman, and her statement of its purpose is entitled to careful consideration, particularly in view of the similar statements found in the committee report. Representative Eilberg's statements concerning the intent of the subcommittee which first approved the Holtzman Amendment is equally persuasive.

The Holtzman Amendment's purpose of reaching war criminals is further clarified by statements in the legislative history indicating the degree of participation in persecution necessary to come within the Holtzman Amendment. The statement of the Holtzman Amendment's purpose reads:

#### Purpose of the Bill

The purpose of the bill is to exclude from admission to the United States *aliens who have persecuted* any person on the basis of race, religion, national origin, or political opinion and to facilitate the deportation of such aliens who have been admitted into the United States.

H.R.Rep. No. 95–1452, 95th Cong., 2d Sess. at 1, *reprinted in* 1978 U.S.Code Cong. & Admin.News 4700. This language appears to require active participation in persecution going beyond "assistance." In discussing the Holtzman Amendment's application, the House Report goes on to state that "it is important to stress that the conduct envisioned must be of a deliberate and severe nature and such that is condemned by civilized governments, ..." *Id.* at 7, 1978 U.S.Code Cong. & Admin.News at 4706.

#### B.

*Fedorenko* established that the DPA provision making persons who assisted in Nazi persecutions ineligible for immigration visas did not depend upon whether the visa applicant had acted voluntarily. Thus, standing alone, the fact that the petitioner in this case acted involuntarily would not have rendered him eligible for entry into the U.S. under the DPA. If the Holtzman Amendment is to be given precisely the same meaning as the DPA, we agree that involuntariness alone would not preclude deportation under section 1251(a)(19). We need not address the difficult question of the effect of involuntariness, standing alone, under the Holtzman Amendment, however, for after disposing of the voluntariness issue, the *Fedorenko* court added the frequently quoted footnote 34.

In the footnote, the Supreme Court stated that the proper focus of a court faced with the problem of limiting the DPA's exclusionary language only to those whom Congress intended to exclude should be upon "whether particular conduct can be considered assisting in the *persecution* of civilians." 449 U.S. at 512 n. 34, 101 S.Ct. at 750 n. 34 (emphasis in original). Fedorenko was found subject to denaturalization for several reasons. He was "a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders from the commandant of the camp...." *Id.* Obviously, Fedorenko's most egregious conduct was shooting at escaping inmates. The petitioner in the present case, Petkiewytsch, did not ever fire his rifle or otherwise abuse or attempt to injure an inmate.

If, as the Supreme Court stated, the focus under the DPA should be on the "particular conduct" of the immigrant, then given the legislative history of the Holtzman Amendment, that focus should be even more searching under § 1251(a)(19). Although Petkiewytsch wore a uniform and carried a rifle, the Board found that he was

at all times a reluctant civilian guard, once himself imprisoned for failing to perform his guard duties diligently. The camp where he served was the least punitive of all types of Nazi camps. The Board also found that the petitioner served under duress and that he was told he would be shot if he attempted to escape. He never personally engaged in acts of persecution, and was released by the British authorities, who interned him as a suspected war criminal, upon a finding that the charges could not be sustained. His "particular conduct" just does not fit the description of a "Nazi war criminal" or a "person[ ] who engaged in war crimes," repeatedly described as the class sought to be made deportable by the Holtzman Amendment.

Given all the circumstances disclosed by this record, we do not believe that *Fedorenko* requires a finding that Petkiewytsch is subject to deportation under § 1251(a)(19). Deporting this petitioner would not further the goal of the Holtzman Amendment and would carry out no discernable policy of the United States.

## VII.

■ In addition to seeking deportation under the Holtzman Amendment, the Order to Show Cause alleged that the petitioner was also subject to deportation under 8 U.S.C. §§ 1251(a)(1) & (2). Subsection (a)(1) provides for the deportation of one who was excludable by the law existing at the time of entry into the United States, and subsection (a)(2) provides for the deportation of one who entered the United States in violation of Chapter 12 of the Immigration and Nationality Act. The Order to Show Cause alleges that petitioner was excludable from entry into the United States under subsection (a)(1) and that his entry was illegal under subsection (a)(2). The gist of this charge is that Petkiewytsch had procured documentation for entry into the United States "by fraud or willfully misrepresenting a material fact[,] ..." 8 U.S.C. § 1182(a)(19), and thus was excludible and his entry illegal.

The Board did not reach this charge, and the parties have not raised it here. We agree with the *Maikovskis* court that when an alien has made misrepresentations, "the materiality of the misrepresentations is established where the government shows that disclosure of the concealed information probably would have led to the discovery of facts warranting the denial of a visa." 773 F.2d at 442. In view of our conclusion that Petkiewytsch's service for eight months as a guard at Kiel–Hasse did not subject him to deportation, we do not believe his failure to disclose that conduct related to a "material fact." Furthermore, it would be hard to conclude that the petitioner's failure to disclose his post-war internment was a "willful[ ] misrepresentation" given his complete exoneration by the British authorities.

The petition for review is granted and the decision of the Board of Immigration Appeals is reversed.