

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-13-2005

# Szehinskyj v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 04-3710

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Szehinskyj v. Atty Gen USA" (2005). *2005 Decisions.* Paper 23.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/23

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————

No. 04-3710

————

THEODOR SZEHINSKYJ,

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent

————

On Petition for Review from an
Order of the Board of Immigration Appeals
(Board No. A07 900 159)

————

Submitted Under Third Circuit LAR 34.1(a)
October 27, 2005

Before:  SLOVITER, FISHER, and GREENBERG, *Circuit
Judges*.

(Filed: December 13, 2005)

Andre Michniak
Michniak, Bezpalko & Associates
1420 Walnut Street, Suite 801
Philadelphia, PA  19102
        *Attorney for Petitioner*

David W. Folts
U.S. Department of Justice
10th & Constitution Avenue, N.W.
OSI Suite 200
Washington, D.C.  20530

William H. Kenety V
U.S. Department of Justice
Office of Special Investigations
1001 G Street, N.W.
Washington, D.C.  20530
        *Attorneys for Respondent*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

At issue in this case is whether the statutory language "assisted in persecution" means the same thing in the Displaced Persons Act of 1948 and the Holtzman Amendment of 1978. We hold that it does.

2

I.

Petitioner Theodor Szehinskyj entered the United States in 1950 and was naturalized in 1958.  He was denaturalized on July 24, 2000, following trial on the issue of whether he had illegally procured entry into the United States in 1950 under the Displaced Persons Act of 1948 ("DPA"), Pub. L. No. 80-774, 62 Stat. 1009, *amended by* Pub. L. No. 81-555, 64 Stat. 219 (1950). The DPA provided for expedited immigration to the United States following World War II, with the restriction that, inter alia, "[n]o visas shall be issued under the provisions of this Act . . . to any person who advocated or assisted in the persecution of any person because of race, religion, or national origin." Pub. L. No. 81-555 § 13.  In recent years, based on archival documents that became available after the collapse of the Soviet Union, the government has pursued denaturalization proceedings against a number of alleged former Nazis, on the grounds that they were ineligible for admission under the DPA because of their conduct during the war.  In this case, the government charged that Szehinskyj had been a prison guard at several concentration camps and a member of the Waffen SS, a special army unit in charge of the concentration camps.  The district court found that Szehinskyj had been a concentration camp guard and an SS member, and as such had assisted in persecution, and that he was therefore ineligible for entry under the DPA. *United States v. Szehinskyj*, 104 F. Supp. 2d 480, 499 (E.D.P.A. 2000).

After Szehinskyj had exhausted his appeals, *see United States v. Szehinskyj*, 277 F.3d 331 (3d Cir. 2002), the government instituted removal proceedings under the Holtzman

Amendment, Pub. L. No. 95-549, 92 Stat. 2065 (1978), which provides for the exclusion and removal of any alien "who, during the period beginning on March 23, 1933, and ending on May 8, 1945, under the direction of, or in association with [Nazi Germany or its allies] ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion. . . ." 8 U.S.C. § 1182(a)(3)(E).[1]

At those proceedings, the government moved to estop Szehinskyj from challenging the removal order on the grounds that the identical issue had been litigated in the district court in the denaturalization trial, and that the conditions for application of collateral estoppel had been met. The Immigration Judge ("IJ") granted the motion, and found Szehinskyj to be removable. The Board of Immigration Appeals ("BIA") affirmed.

## II.

Because the BIA affirmed the IJ's ruling without opinion, we review the opinion of the IJ. *Partyka v. Attorney General*, 417 F.3d 408, 411 (3d Cir. 2005). Application of collateral estoppel is a question of law, *Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n*, 342 F.3d 242, 252 (3d Cir. 2003), and we

---

[1]The Holtzman amendment is codified in two places, 8 U.S.C. § 1182(a)(3)(E) (providing for exclusion of the listed class of aliens) and 8 U.S.C. § 1227(a)(4)(D) (providing for removal of the same class, incorporated by reference).

4

exercise plenary review of the BIA's legal determinations, subject to established principles of deference. *See Auguste v. Ridge*, 395 F.3d 123, 144 (3d Cir. 2005); *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984).

## III.

The Supreme Court has described the doctrine of collateral estoppel as follows:

> [O]nce an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action that involves a party to the prior litigation.

*Montana v. United States*, 440 U.S. 147, 153 (1979). As we have recently explained:

> [T]he standard requirements for collateral estoppel, more generally termed issue preclusion, [are] (1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action.

*Henglein v. Colt Indus. Operating Corp.*, 260 F.3d 201, 209 (3d Cir. 2001) (citing *Raytech Corp. v. White*, 54 F.3d 187, 190 (3d

5

Cir. 1995) and *Restatement (Second) of Judgments* § 27 cmt. j (1982)) (internal quotation marks omitted).

The IJ held that "the factual and legal issues decided in the denaturalization trial are identical to those to be decided in the instant proceeding," and that because Szehinskyj was represented in the denaturalization trial and had a full and fair opportunity to litigate the issues presented there, collateral estoppel properly applied. At the denaturalization trial, the government "proved by 'clear, unequivocal, and convincing' evidence that Szehinskyj was a member of the SS Death's Head Battalion," that "the [concentration] camps were 'places of utter, devastating persecution,'" and that serving as an armed guard at a concentration camp is sufficient to establish assistance in persecution.

Szehinskyj's appeals of his denaturalization proceeding have been exhausted, so he cannot challenge those findings here. Nor does he argue that he was not adequately represented at the denaturalization trial, that the nature of his activities during World War II was not actually litigated there, or that specification of those activities was not necessary to the denaturalization decision. Instead, he contends that the issues in the two proceedings are not identical. He suggests that the statutory provision under which the government now seeks to deport him requires a different showing from that required by the statutory provision under which his citizenship was revoked. Specifically, he contends that section 13 of the DPA applies to a broader set of conduct and individuals than does the identical language of the Holtzman Amendment. The Holtzman Amendment, Szehinskyj argues, applies only to "Nazi war

6

criminals," and thus the district court's finding that Szehinskyj "assisted in [Nazi] persecution" under the DPA should not be conclusive of the question of whether he is deportable under the Holtzman Amendment.

The Holtzman Amendment provides that any alien is deportable "who, during the period beginning on March 23, 1933, and ending on May 8, 1945, under the direction of, or in association with [Nazi Germany or its allies] ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion." 8 U.S.C. § 1182(a)(3)(E). The relevant language, "assisted in persecution," is precisely the same in the Holtzman Amendment as in the provision of the DPA, quoted above, at issue in Szehinskyj's denaturalization trial.

Szehinskyj nonetheless quotes from floor speeches in the House of Representatives and argues that because the term "Nazi war criminal" was used "at least 11 times in the floor debate," Congress's intent was that only "war criminals" would be covered by the statutory language, and not – the words of the text notwithstanding – all those who assisted in Nazi persecution. Szehinskyj rests his argument squarely upon the House floor speeches, because his interpretation flies directly in the face of the plain language of the statutory text. He urges that the Sixth Circuit's decision in *Petkiewytsch v. INS*, 945 F.2d 871 (6th Cir. 1991), which used the same floor speeches to reach the result Szehinskyj seeks in this Court, should be taken as judicial validation of this approach.

7

We reject Szehinskyj's argument for two reasons. First, the statutory language is not ambiguous, and is contrary to Szehinskyj's interpretation. Second, scrutiny of the full floor debate reveals absolutely no suggestion of the distinction Szehinskyj proposes. Szehinskyj's selective invocation of fragments of the floor debate is an object lesson in the perils of appealing to this particular kind of legislative history as a guide to statutory meaning.[2] This case is a perfect illustration of the well-known admonition that what individual legislators say a statute will do, and what the language of the statute provides, may be far apart indeed. The law is what Congress enacts, not what its members say on the floor. This axiom has particular force in this case, and we think it appropriate to analyze the floor debate in some detail, because we have not yet had occasion to decide the precise scope of the Holtzman Amendment.

IV.

Szehinskyj's contention that the floor debate evidences a congressional intent to cover only "war crimes" in the Holtzman Amendment is simply not borne out by examination of the record. Szehinskyj quotes several statements from

---

[2]Even the most ardent academic defenders of the use of legislative history in statutory interpretation are quick to disavow cherry-picking from floor speeches. *See, e.g.*, Lawrence M. Solan, *Private Language, Public Laws: The Central Role of Legislative Intent in Statutory Interpretation*, 93 Geo. L. J. 427, 447-48 (2005) ("[S]tray remarks from individual legislators . . . are most often not probative of much of anything.").

Representative Holtzman, the amendment's sponsor, which he claims show that she did not intend the bill to include the same broad category of persecution as the DPA. But Szehinskyj's quotations are very selective. The distinction at issue in the floor debate is not between Nazi "persecutors" and Nazi "war criminals," but rather between Nazi persecutors and persecutors from other, non-Nazi, regimes.

The floor debate was prompted by concerns raised in committee that the language as originally proposed – language that did not limit the bill's application to actions carried out under the Nazi regime – was too broad, and would include "a goodly proportion of the heads of state of the various nations of the world . . . because in many cases . . . they have engaged in persecution of people for political and other reasons." 124 C.R. at 31,649 (statement of Rep. Seiberling). The five dissenting members of the committee had protested that the statute would include many of our allies:

> While the original object of this legislation was to deal with alleged Nazis in this country, the bill as reported applies to anyone who persecutes others based on race, religion, national origin, or political opinion. Would this apply to Vietnamese who 'persecuted' Communists because of their political opinion, as did many of our allies during the Vietnam War? Would this apply to British soldiers who 'persecuted' Catholics in Northern Ireland because of their religion? Would this apply to white South Africans or Rhodesians who are members of or who support the present

9

governments that have allegedly persecuted blacks because of their race? What future situations will arise where persons working for our friends and allies allegedly persecuted others who are our political adversaries or enemies in war and thereby are ineligible to enter the United States?

H.R. Rep. 95-1452, 9th Cong., 2d Sess. at *17 (dissenting views of Reps. Wiggins, Kastenmeier, Butler, Hyde, and Ertel).

The proposed amendment was designed to meet that objection, and its sponsors sought to reassure opponents that the reach of the bill would be limited to Nazis. Representative Fish put it as follows: "There has been criticism in committee of the bill as originally reported as being too broad, raising potential future problems in its application. However, with the amendment to the bill which we now consider, this provision would be restricted in its application to those who engaged in persecution at the direction of the Nazi government." 124 C.R. at 31,648 (statement of Rep. Fish). This statement makes it clear that Representative Fish's earlier statement, which Szehinskyj quotes, that "our intent [is] to restrict the scope of this bill to Nazi war criminals, as opposed to any person who persecutes," 124 C.R. at 31,648, is drawing a distinction between the Nazis and other regimes, and not between some Nazis and other Nazis. Szehinskyj baldly misrepresents the meaning of this statement by underlining "Nazi war criminals" and suggesting that somehow the statute distinguishes between Nazi non-war-criminal persecutors and Nazi war-criminal persecutors. There is nothing in the debate even hinting at a

10

distinction between those Nazis who "merely" persecuted and those Nazis who committed "war crimes."

In her opening statement, Representative Holtzman described the amendment as operating "to exclude from admission into, and to deport from the United States all aliens who persecuted any person on the basis of race, religion, national origin, or political opinion, under the direction of the Nazi government of Germany . . ." 124 C.R. 31,646. This description straightforwardly tracks the language of the statute. Representative Holtzman then stated that the language in the amendment was deliberately chosen to match that in the DPA. "Let me state to my colleagues that the language of the bill is not new. Two prior laws – the Displaced Persons Act of 1948 and the Refugee Relief Act of 1953 – contained language prohibiting the entry into the United States of persons who engaged in persecution on account of race, religion, or national origin. . . . The omission of such language from current law has hampered the Immigration Service's efforts to act against alleged Nazi war criminals." *Id.* at 31,647. Here, and repeatedly throughout the debate, members used terms such as "war criminals" and "mass murderers" to refer to the Nazis, as they sought to emphasize the importance of the issue by recalling the brutality of the Nazi regime. Several members invoked the horrors of the Holocaust, including Representative Eilberg. Szehinskyj quotes the portion of Rep. Eilberg's statement in which Eilberg describes the Holocaust as "that dreadful period in the history of mankind [that] should forever serve as a tragic reminder to all civilized people of the terrible extremes to which an entire nation can be led by a small, but highly organized group of demented and ruthless leaders. This

11

bill addresses itself to members of that group – to the perpetrators of the Holocaust." 124 CR at 31,647. We have little difficulty believing that many members were motivated to support the bill by their desire to deport notorious war criminals.[3] But even if we thought such speculation relevant to statutory analysis, that motivation does not imply that those members believed that deportation of notorious war criminals was all that the bill authorized.[4] Indeed, Representative Eilberg himself was plainly under no illusions about its broad sweep. In the paragraphs preceding the sentence quoted by Szehinskyj, Representative Eilberg explains exactly what the bill will do: "Mr. Speaker, the purpose of this bill . . . is to prevent the entry into, as well as facilitate the deportation from, the United States of aliens who have engaged in persecution based on race, religion, national origin or political opinion under the Nazis." 124 C.R. at 31,647.

It is evident that the term "war criminals," as used by Representative Holtzman and the other speakers in the debate, is simply a rhetorical descriptor for "Nazis," and not, as Szehinskyj would have it, a technical legal term applying only to those susceptible to prosecution at Nuremberg. For example, Representative Holtzman observes that "[s]ince 1952 there has

---

[3]There is a suggestion in the floor debates that some members had particular alleged former Nazis in mind. *See* 124 C.R. at 31,649 (statements of Rep. Fish and Rep. Wiggins).

[4]Nor would it help Szehinskyj, unless we thought that what any particular members believed the bill authorized determines what the bill in fact authorized. And we do not.

12

been no provision in our regular immigration law to exclude or deport Nazi war criminals who persecuted people for racial, religious, or other reasons," and describes the bill as intended to "close this loophole" by "denying sanctuary in the United States to Nazi war criminals." *Id.* at 31,647. Any suggestion that "war criminals" has a technical meaning here that excludes simple persecution is destroyed by Representative Holtzman's next sentence: "The bill includes an amendment limiting the applicability of H.R. 12509, as reported out of the Committee on the Judiciary, to persons who engaged in persecution under the Nazis." *Id.* This statement makes three interpretive points crystal clear, all of which vitiate Szehinskyj's argument. First, Representative Holtzman clearly believes that the amendment will apply to "persons who engaged in persecution under the Nazis." Therefore, second, either she is using "war criminals" synonymously with "persons who engaged in persecution under the Nazis,"or she is explicitly stating that the coverage of the proposed language extends beyond just "war criminals."[5] Third, she is reiterating – as speakers do throughout the debate – that the "limitation" in the amendment's coverage is limitation to Nazis as opposed to members of other regimes. This is in sharp contrast to Szehinskyj's contention that there was some contemplated distinction between run-of-the-mill Nazi persecutors (not covered) and higher-up Nazi "war criminals" (covered).

---

[5]As Representative Eilberg appears to do. *See* 124 C.R. at 647 (statement of Rep. Eilberg) (referring to the amendment as covering "war atrocities and other acts of persecution").

13

Szehinskyj has conflated the problem which prompted the legislature to act with the action the legislature took. No doubt some members voted for the bill in order to root out full-blown Nazi war criminals hiding in the United States. But the bill they enacted as law does not restrict its coverage to war criminals. It covers all those who assisted in persecution. It is simply not for us to speculate about individual legislators' views about what they thought would happen once the bill became law, and still less is it for us to rewrite a duly enacted law on the basis of our speculations about those views. Among the most common rhetorical devices in politics is the repeated invocation of an extreme example of a given problem as a justification for legislation addressing that problem that, when enacted, sweeps far more broadly than would be necessary to target just that extreme example. The tenor of this floor debate is unremarkable in that respect, and will be familiar to anyone who has spent time in legislatures. The bill's sponsors invoked the problem of "Nazi war criminals" living in the United States in order to win passage of a bill excluding not just "war criminals," but a far broader class of people.

Nor does it appear that members were particularly concerned about overbreadth once language was inserted specifying that the bill would apply only to Nazis. The only overbreadth concern with respect to Germans – a concern Szehinskyj asks us to read into the statute – is raised by Representative Seiberling:

> In a certain sense, the entire population of Germany, except for the resistance, participated in the persecution of Jews and others in Germany

14

under the Nazi regime. I assume it is not the intention to include all those who did not actively oppose the German Nazi regime actions within the scope of this language; is that correct?

*Id.* at 31,649. Representative Holtzman replied: "[T]he bill is intended to cover active participation and not mere acquiescence by the population as a whole." *Id.* This is the only distinction between classes of Germans found anywhere in the debate. And it is of no use to Szehinskyj, because Szehinskyj, who worked as a prison guard at a concentration camp, went far beyond "mere acquiescence by the population as a whole."[6] And this is not Szehinskyj's contention in any case. He does not deny that he has been adjudicated to have "actively participated" in Nazi persecution; he simply argues that his participation was "mere" persecution, and not "war crimes." Whatever difference that distinction may make in other arenas, it has no application to the Holtzman Amendment.

V.

To the extent that the Sixth Circuit's decision in *Petkiewytsch v. INS*, 945 F.2d 871 (6th Cir. 1991), remains good law, we reject the Sixth Circuit's approach. In *Petkiewytsch*, the court drew a distinction between the language enacted by

---

[6]*Accord United States v. Reimer*, 356 F.3d 456, 459 (2d Cir. 2004); *United States v. Tittjung*, 235 F.3d 330, 341 (7th Cir. 2000); *Tittjung v. Reno*, 199 F.3d 393, 398 (7th Cir. 2000); *United States v. Breyer*, 41 F.3d 884, 890 (3d Cir. 1994).

15

Congress and the "purpose" the court saw as indicated by the floor debate and the committee report. The court found two respects in which that apparent purpose was in direct conflict with the language of the statute. First, while the statute by its plain terms covers all those who "ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion," 8 U.S.C. § 1182 (3)(E), the court discerned a "purpose to require active participation in persecution going beyond 'assistance.'" 945 F.2d at 880. The *Petkiewytsch* court, in other words, deleted the term "assisted" from the statute. It took this step on the basis of the floor debate and the committee report, which stated that "[t]he purpose of the bill is to exclude from admission into the United States aliens who have persecuted any person on the basis of race, religion, national origin, or political opinion, and to facilitate the deportation of such aliens who have been admitted to the United States." H.R. Rep. 95-1452, 95th Cong., 2d Sess., at 1. The court reasoned that because the committee statement said "persecuted" rather than "assisted in persecution," the statute, which did say "assisted," didn't really mean it.[7]

Second, the court, as Szehinskyj does here, counted up the number of times the term "war criminals" was used in the floor debates. Tallying nineteen instances (as compared to

---

[7]The court did not address the other verbs found in the statute but not the committee statement, namely "ordered," "incited," and "otherwise participated." *Compare* 8 U.S.C. § 1182 (3)(E) *with* H.R. Rep. 95-1452 at 1.

16

Szehinskyj's modest "at least eleven"), the court concluded that the Holtzman Amendment had the "purpose of reaching war criminals," 945 F.2d at 880, and that "the class sought to be made deportable" by the amendment was "[people] who engaged in war crimes." *Id.* at 881. Because Petkiewytsch only "assisted" in persecution and did not take an "active role," and because what he did "just does not fit the description of a 'Nazi war criminal,'" *id.*, the court held that the Holtzman Amendment did not cover Petkiewytsch.

This Court cannot countenance such an extraordinary act of judicial reformation of duly enacted legislation. The *Petkiewytsch* court disregarded the plain language of a statute passed by Congress, presented to the President, and signed into law. The court inferred a congressional purpose quite at odds with the language of the statute, on the basis of snippets of floor debate involving only eight out of 535 members of Congress, and snippets of a committee report which was neither voted on, nor presented, nor signed, which was not endorsed by the full committee, and which may or may not have even been read by the members who voted on the bill itself. Faced with such a conflict,[8] there can be no doubt about the interpretation that the

---

[8]Assuming a genuine conflict, that is, *Petkiewytsch* is wrong. But we think *Petkiewytsch* is doubly wrong, because, as explained above, our reading of the legislative history reveals no such conflict. Five members of the committee dissented from the committee report on the grounds that in their view the bill would cover too *many* people, *see* H.R. Rep. 95-1452, 95th Cong., 2d Sess., at *17 (dissenting views of Reps. Wiggins, Kastenmeier, Butler, Hyde, and Ertel); the invocations of "Nazi war criminals" in the floor debate are

17

courts must enforce. Where floor speeches and statutory language collide, the floor speeches must give way: Congress's constitutional voice is the text of the statutes it enacts.

The Sixth Circuit itself appears to have been uncomfortable with the reasoning in *Petkiewytsch*, and in *Hammer v. INS*, 195 F.3d 836 (6th Cir. 1999), the court took some pains to limit *Petkiewytsch* and disavow its approach. In *Hammer*, the court held that the wartime activities of an SS prison guard subjected him to removal under the Holtzman Amendment.[9] *Petkiewytsch* was not to the contrary, the court declared; rather, it "appears to stand for the proposition that some forms of 'assistance' to the Nazi regime . . . may be too attenuated to be considered 'under the direction of, or in association with' the Nazi government." *Id.* at 844. This "attenuation" theory is nowhere found in *Petkiewytsch*, but some alternative reading of the case had to be discovered in order to square *Petkiewytsch* with the language of the statute: "We do not believe that *Petkiewytsch* compels the conclusion that 'assistance' to the Nazi regime can never be sufficient for deportation under the Holzman Amendment, because such an interpretation would be squarely at odds with the text of the statute." *Id.*

---

obviously rhetorical; and the debate itself was triggered by concerns that the amendment might reach non-Nazis, not that it might reach non-war criminal Nazis.

[9]It would thus appear that had Szehinskyj's case arisen in the Sixth Circuit, *Hammer* and not *Petkiewytsch* would control, and the result would be the same.

18

We agree with the *Hammer* court that the text of a statute controls our interpretation of it. The Holzman Amendment means what it says, and what it says is that Szehinskyj is deportable if he assisted in Nazi persecution. In so holding we are in agreement with other Circuits that have faced this question. *See, e.g.*, *Dailide v. United States Att'y. Gen.*, 387 F.3d 1335, 1344 (11th Cir. 2004) ("[A] plain reading of the Holtzman Amendment reveals that an individual's assistance, or some other form of participation in the persecution of any person, would be sufficient [for removal]"); *Tittjung v. Reno*, 199 F.3d 393, 398-99 (7th Cir. 1999) ("[T]his Court has consistently held that Nazi concentration camp guards assisted in persecution. . . . [Such conduct] falls squarely within the meaning of the Holtzman Amendment.").

## VI.

Because Szehinskyj has been fairly adjudicated to have assisted in Nazi persecution under a statute whose provisions are identical to those of the Holzman Amendment, he is estopped from relitigating that issue in these removal proceedings. Accordingly we will deny the petition for review.

19