**Reinhold KULLE, Petitioner,**

v.

**IMMIGRATION & NATURALIZATION SERVICE, Respondent.**

**No. 86–1277.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 10, 1986.

Decided Aug. 5, 1987.

Charles Nixon, Chicago, Ill., for petitioner.

Ronnie L. Edelman, U.S. Dept. of Justice, Washington, D.C., for respondent.

Before COFFEY and EASTERBROOK, Circuit Judges, and GRANT, Senior District Judge.[*]

GRANT, Senior District Judge.

In a decision rendered on November 20, 1984, Immigration Judge Olga Springer ordered Reinhold Kulle deported to the Federal Republic of Germany under section 241(a)(19) of the Immigration and Nationality Act as amended. In its decision of December 10, 1985, the Board of Immigration Appeals ("Board") dismissed Kulle's appeal, agreeing with the judge that Kulle was deportable. He now appeals, and we affirm, the decision of the Board.

## I.

Kulle was born in 1921, in the Breslau district of Silesia, once a part of Germany but now a part of Poland. He remains a citizen of Germany, although he was admitted to the United States for permanent residence on November 7, 1957. As a teenager, in 1940, Kulle joined the Waffen SS of the German military and served that notorious arm of the Nazi regime through May of 1945. The government's Order to Show Cause alleged that Kulle served with the Death's Head (Totenkopf) Division of the Waffen SS, which required his duty in France, Austria, the Soviet Union and throughout Nazi Germany. For his services, Kulle received the decoration of the Iron Cross Second Class. In August of 1942, Kulle was assigned to the Death's Head Battalion at Gross-Rosen, a concentration camp in Kulle's native Silesia. During his nearly three-year tenure at Gross-Rosen, Kulle received a promotion to the rank of corporal and another to the rank of sergeant. He worked as a guard and as a training leader.

The Order to Show Cause further alleged that Kulle's position as a guard involved the armed guarding of Gross-Rosen prisoners under the strain of forced labor. As a training leader, Kulle instructed SS recruits in the use of weapons. Most importantly, the Order to Show Cause alleged that during Kulle's term at Gross-Rosen the camp was a place for persecution of prisoners of the Nazi regime. The persecution included forcible internment and slave labor of prisoners for reasons of race, religion, national origin or political opinion. The Order also alleged that in January of 1945 Kulle participated in the forced evacuation of prisoners, via open freight cars, from Gross-Rosen to Mauthausen, an infamous concentration camp in Austria.

In the Order to Show Cause, the government asserted that Kulle was deportable because, as an instrument of the Nazi regime, he participated in the persecution of persons on account of their race, religion, national origin or political opinion. The government also alleged deportability on the grounds that Kulle procured his immigrant visa by misrepresenting material facts, and that he therefore does not possess a valid visa. At the deportation hearing held on January 17, 1983, Kulle denied all charges of deportability. The immigration judge denied various motions, including Kulle's motions for discovery and jury trial. Kulle petitioned for, and was denied, a writ of mandamus to compel discovery. *Kulle v. Springer,* 566 F.Supp. 279 (N.D. Ill.1983). Once the deportation hearing was reconvened, Judge Springer issued a forty-seven page decision declaring Kulle deportable on the basis of clear and convincing evidence indicating his participation in the persecution of persons because of race, religion, political opinion or nationality. The government's evidence at the deportation hearing consisted of various documents, Kulle's statements made under oath in an interview held on August 14, 1982, and testimony from six witnesses. The witnesses included a German history professor, four survivors of Gross-Rosen, and a former Foreign Service Officer of the American Consulate in Frankfurt, Germany, where Kulle obtained his visa in September of 1957.

On appeal, the Board agreed that the evidence demonstrated Kulle's assistance in the persecution of persons because of

---

[*] The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

their race, religion or political opinion. The Board also concluded that the record established additional charges of deportability because Kulle entered the United States by fraud and with an invalid immigrant visa. On this appeal Kulle contests the dual grounds for his deportation, and he also contends that he was not afforded a fair trial.

## II.

■ Section 241(a)(19) of the Immigration and Nationality Act ("INA"), known as the "Holtzman Amendment," mandates deportation of any alien who:

during the period beginning on March 23, 1933, and ending on May 8, 1945, under the direction of, or in association with (A) the Nazi government of Germany, (B) any government in any area occupied by the military forces of the Nazi government of Germany, (C) any government established with the assistance or cooperation of the Nazi government of Germany, or (D) any government which was an ally of the Nazi government of Germany, ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion.

8 U.S.C. § 1251(a)(19).

Kulle attacks the legislation on its face, arguing that the term "persecution" is unconstitutionally vague and overbroad, that the Holtzman Amendment, enacted in 1978, is an *ex post facto* law, and that it is a bill of attainder inflicting punishment without a judicial trial. These arguments must fail, however, as they did in our decision of *Schellong v. Immigration and Naturalization Service,* 805 F.2d 655 (7th Cir.1986). As we explained in *Schellong,* the term "persecution" is adequately defined by legislative history and court interpretations, 805 F.2d at 662, and rather than punish individuals for actions previously taken, the Holtzman Amendment merely "ensure[s] that the United States is not a haven for individuals who assisted the Nazis in the brutal persecution and murder of millions of people." *Id.*

■ Kulle next argues that the evidence is not sufficiently clear and convincing to establish that Gross-Rosen was a place of persecution or that he ever assisted in persecution. Kulle insists *he* never persecuted anybody. The government does not really attempt to make that argument, but relies instead on a theory which places Kulle in a camp of widespread persecution. But Kulle disagrees, arguing that the government "manufactured" expert testimony to fit its trial objective of depicting Gross-Rosen as a place of persecution. According to Kulle, the government pursued this course despite the fact that not one standard historical work on the Nazi era describes Gross-Rosen as a place of persecution, and the only reputable book mentioning Gross-Rosen states that it was a camp predominantly populated by criminals. Thus, in Kulle's view, the government had to rely on an inherently unreliable source, a book by Mieczyslow Moldawa entitled *Gross-Rosen: A Concentration Camp in Silesia.* Kulle's criticism of this source stems primarily from the author's method of compiling a very detailed description of the camp—a method which required no citation to authority, no prior note-taking or diary, and no research.

The government contests Kulle's view of the evidence and argues that its expert witness, Dr. Charles Sydnor, a professor in modern German history, testified that as of May 1, 1941, Gross-Rosen was established as an independent concentration camp. Prisoners worked in the nearby granite quarries. According to Sydnor, the prisoner population among Gross-Rosen and its many subcamps exceeded 10,000 by 1945, and it included persons of various nationalities and religions. Sydnor was adamant, however, that Gross-Rosen was *not* primarily a place for ordinary criminals but instead was a place for incarceration and severe treatment of disfavored religions and races (e.g., Jews and Slavs), and of political opponents of the Nazi regime. The different classifications of prisoners were identified by the patch: for example, political prisoners wore red patches and Jews wore the yellow Star of David.

Kulle, in fact, admitted to knowing Jewish prisoners "through the patch."

The government also offered the testimony of four Polish prisoners who suffered at Gross-Rosen. All alleged to be imprisoned for political reasons during Kulle's term at Gross-Rosen, and all testified to the brutal conditions existing there. Moldawa testified that construction on a gas chamber at Gross-Rosen was started in 1944 but never completed. He related the cruel and arbitrary treatment of prisoners, including a punishment of death for arriving late to roll call. Marcel Lubasz testified that SS guards regularly beat the prisoners and maintained constant surveillance over the forced labor at worksites. Ludwig Kozlowski related how, upon arrival at Gross-Rosen, SS guards beat and kicked prisoners embarking from trains. He recalled the mass execution of Russian prisoners during April of 1943. Marion Wojciechowski testified to the ritual of beatings delivered by SS guards. He claimed the Jews received the worst treatment. Judge Springer found that "all of the witnesses who testified were credible."

For his part, Kulle testified that he never served as a guard within the camp itself. His guard duties included a day shift along the perimeter of Gross-Rosen, a night shift in the watchtowers located outside the protective custody area, and some guarding of work groups engaged in digging and loading. "Kapos," or criminal prisoners, were the enforcers of the work groups. Kulle testified that the kapos, not the guards, punished the prisoners when they refused to work. Kulle insists he did not have authority to shoot prisoners attempting escape. As a corporal, Kulle began training recruits for combat, and upon becoming a sergeant, Kulle trained more and guarded less. He denied ever seeing a prisoner beaten or shot. He claimed he brought one prisoner a chicken upon returning from leave, and he brought another prisoner water on the train to Mauthausen. Kulle insists he was merely a passenger, not a guard, on the trip to Mauthausen.

■ *Schellong v. Immigration and Naturalization Service*, 805 F.2d at 655,

was a similar case, although Conrad Schellong served at Sachsenburg and Dachau— two well-known "death mills." In *Schellong*, we placed much reliance on the Supreme Court decision in *Fedorenko v. United States*, 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981), for direction on the issue of "persecution." Now Kulle argues that *Fedorenko* cannot control the decision in this case because *Fedorenko* was a denaturalization, not a deportation, case; Fedorenko was admitted under the Displaced Persons Act of 1948, which declares an alien ineligible for admission if he has engaged in activity "hostile to the United States"—a much lower standard than what is required in Kulle's case; crimes against humanity were not proven here and Kulle cannot be found culpable for what could only possibly amount to gross negligence; and *Fedorenko* involved much different facts. Kulle insists it should make a difference that Fedorenko served at Treblinka, a notorious death camp where the guards systematically killed their Jewish prisoners by treating them like animals. But our decision in *Schellong*, a deportation case, teaches that none of these distinctions makes a difference. Because the statute authorizes deportation of anyone who "assisted" in persecution, personal involvement in atrocities need not be proven.

> [A]n individual who served as a guard has assisted in persecution for purposes of Section 1251(a)(19).... Nazi concentration camps were places of persecution; individuals who, armed with guns, held the prisoners captive and prodded them into forced labor with threats of death or capital punishment cannot deny that they aided the Nazis in their program of racial, political and religious oppression.

*Schellong*, 805 F.2d at 661.

■ Likewise, it is to no avail for Kulle to argue that, according to the international standards established at Nuremberg and other post-war trials, *see, e.g., Josef Kramer and 44 others (Belsen Trial)*, United Nations War Crimes Commission (1945), the court cannot determine that he was active in persecution of prisoners merely because he was present. Kulle urges this

Court to find that there must at least be some proof of actual knowledge of, or an opportunity to prevent, the wrongful acts of persecution before a court of law can declare that Kulle in fact participated or assisted in the persecution. This argument, however, fails on the weight of its irrelevancy. This is a deportation case. The proof is directed toward showing presence at a place of persecution, and "assistance" in persecution is inferred from the circumstances. This is not a criminal proceeding, and the "punishment" is not hanging. The legal principles established at Nuremberg have contributed much to certain spheres of law and to the definition of "persecution." But they have no immediate bearing on a deportation proceeding controlled by a statutory provision which, for all intents and purposes, utilizes the term "assisted" in persecution quite liberally. *See* Massey, *Individual Responsibility for Assisting the Nazis in Persecuting Civilians,* 71 Minn.L.Rev. 97 (1986).

■ Moreover, at the root of the case against Kulle is the credit Judge Springer gave to the government witnesses. She found that

> all of the witnesses who testified were credible. None of them had an "axe to grind" as was alleged by [Kulle's] counsel in his reply brief. None of them identified [Kulle] as an SS man who they recognized from Gross-Rosen. They had nothing to gain by giving false testimony. Their testimony was based upon their own experiences at Gross-Rosen.

Op. at 28.

The Board interpreted the judge's decision to mean that Kulle lacked credibility. Perhaps that is the only inference to be drawn once the testimony of the other witnesses is considered truthful. But we need not speculate on Kulle's credibility, nor will we attempt to fully reassess the credibility of all the witnesses (though there is a temptation to discredit Moldawa's contribution to the case which gives highly detailed information, such as long lists of prisoner numbers, without any aid other than memory.) It is enough to conclude that Judge Springer's credibility choices present no inherent

contradictions, and are supported by the weight of the evidence in the record and by what history instructs about the long reach of Nazi oppression. Kulle cannot now prevail on the basis of his attacks on witness credibility.

■ Finally, it makes no sense for Kulle to contend that Gross-Rosen was merely a camp of forced labor. We have said that incarcerations, forced labor, cruel and inhuman treatment, and arbitrary and severe punishment are sufficient to rise to the level of persecution. *Schellong,* 805 F.2d at 661. We need only recall the Nazis' decree that Jews, Gypsies, Russians, Ukrainians and Poles must suffer "extermination through work." Once the fact of forced labor is established, the remaining proof is routinely satisfied. It seems clear to us that the tagging of prisoners along racial, national, or religious lines creates a strong presumption of persecution because of race, religion, national origin or political opinion. The fact that some prisoners were criminals does not rebut the presumption. We agree with the Board that, in terms of the Holtzman Amendment, substantial evidence indicates Kulle's assistance in persecution of prisoners on the basis of race, religion, national origin, or political opinion.

### III.

Kulle argues that he received an unfair hearing before Judge Springer. The court denied Kulle discovery, and he responded with a mandamus suit. Relief was denied. Kulle contends the slow manner or lack of discovery hampered his ability to prepare a defense. For example, the Office of Special Investigations ("O.S.I.") tendered Moldawa's book only two days before it became evidence, and the judge denied discovery of the immigration papers of witnesses Kozlowski and Wojciechowski. Kulle argues these rulings denied him a fair hearing.

Kulle objects to the quantity of hearsay utilized by the government, and to the fact that Judge Springer permitted government attorneys to discuss testimony with witnesses during breaks in the trial. Kulle contends the government "protected" its

witnesses by obstructing their cross-examination. Kulle attempted to impeach to show bias, but the court refused to allow this line of questioning. O.S.I. repeatedly objected to cross-examination.

Kulle contends the immigration court "prejudged" the government witnesses as credible. Kulle expends considerable effort in detailing how he sought to puncture holes in Moldawa's portrayal of Gross-Rosen, and how the judge found any cross-examination of Moldawa to be fruitless. Kulle also objects to Judge Springer's view that impeachment of witness Lubasz would be a waste of time. In prejudging the credibility of witnesses, Kulle argues that the judge abrogated her role as finder of fact.

The government responds that there is no provision for discovery in deportation proceedings, and in any event, Kulle did in fact have knowledge and notice of much of O.S.I.'s case against him. The government contends that after the hearing was adjourned for a month, Kulle could have recalled the government's witnesses as part of his case and examined them further. The government suggests that Kulle's failure to do so must be considered a waiver of his claim that he was allowed insufficient time to utilize materials voluntarily supplied by the government.

■ We cannot agree with Kulle's assessment of the hearing. We think, first, that the government established deportability by "clear, unequivocal, and convincing evidence." *Woodby v. Immigration and Naturalization Service,* 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966). We are also impressed by Judge Springer's consideration of the testimony:

> I very carefully observed the demeanor of each witness as he testified during both direct and cross-examination, which in the case of one witness was especially lengthy and thorough. Each witness testified in a candid and forthright manner, and I find that all of the witnesses who testified were credible.

Op. at 28.

Finally, we believe the hearing was conducted in accordance with the provisions of 8 U.S.C. § 1252 and 8 C.F.R. pt. 242 (1986). According to the rules governing deportation proceedings, the respondent has "a *reasonable opportunity* to examine and object to the evidence against him, to present evidence in his own behalf and to cross-examine witnesses presented by the Government." 8 C.F.R. § 242.16 (emphasis supplied). There is no provision for general discovery, and the right to cross-examine is not unlimited. Given the opportunity for some cross-examination and the judge's statements concerning the credibility of witnesses, we conclude that Judge Springer acted within her discretion to deny further inquiry into the general background and testimony of witnesses.

## IV.

■ Section 212(a) of the INA excludes from entry:

> (19) Any alien who seeks to procure, or has sought to procure, or has procured a visa or other documentation, or seeks to enter the United States, by fraud, or by willfully misrepresenting a material fact;
> (20) Except as otherwise specifically provided in this Act, any immigrant who at the time of application for admission is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this Act, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality, if such document is required under the regulations issued by the Attorney General pursuant to Section 212(a).

8 U.S.C. § 1182(a)(19), (20) (1970).

The Board concluded that Kulle entered the United States by fraud and with an invalid immigrant visa. We agree that, on the basis of the evidence presented, and because any alien who was excludable at the time of entry is deportable, 8 U.S.C. § 1251(a)(1), Section 212(a), is an independent basis for deportability.

Kulle argues that he never lied about his wartime activities. At the deportation hearing, O.S.I. attorneys attempted to

prove otherwise by introducing the tape recording of an interview held on August 14, 1982, the testimony of former Foreign Service Officer John Coffey and the testimony of retired Vice Consul Katherine Geoghegan. The O.S.I. contends (1) the tape reveals that Kulle confessed to lying about his service in the SS because he thought it would bar him from obtaining a visa; (2) the testimony of Foreign Service Officer Coffey establishes that visa applicants at Frankfurt in 1957 were required to complete a German-language questionnaire which inquired into wartime military service; and (3) the testimony of Vice Consul Geoghegan, the signator of Kulle's immigrant visa, demonstrates that Waffen SS guard service would disqualify a visa applicant at the American Consulate-General in Frankfurt.

Kulle contends that the Board failed to consider the full context of his statements made in the interview held in 1982. Kulle was interviewed by Bruce Einhorn of the O.S.I.:

Q. Mr. Kulle, a moment ago off the record you indicated that there were some matters you wanted to explain.

A. Yes.

Q. Did you tell me specifically that you had lied on your immigration papers and that it is that fact which you would now like to explain?

A. Yes.

Q. By immigration papers, are you referring to the papers through which you filed for permission to come to the United States?

A. Yes.

Q. Mr. Kulle, I will give you every opportunity to explain in this way—I would first like you to indicate, so that the record is clear, on what subject precisely you lied. And you may then explain why you did it. So, first, please tell me about what did you lie?

A. I did not say that I was in the SS. I said that I was in the Army.

Q. Are you telling me this is what you told officials who were processing your visa application for the United States?

A. Yes.

Q. What else did you fail to reveal to those officials when asked?

A. I did not admit that I was with the SS. I did not say that I had been with the—that I had been transferred to the concentration camp Gross-Rosen, because that was all connected with the SS.

Q. Are you telling me that when asked to account for your background by those who were processing your United States visa application, you failed to give them truthful answers regarding your service in the SS and specifically at Gross-Rosen?

A. That's correct.

Q. Okay, was it your understanding at the time you made these lies, that if you had told the truth about your SS service you would have been denied admission to the United States?

A. That's correct.

*      *      *      *      *      *

Q. Would you tell me how you went about applying for this visa?

A. I can't say it exactly anymore.

Q. Let me see if I can help you. Did you have a discussion with any officials at the American Embassy, who asked you questions about yourself for the purposes of completing this application?

A. No.

Q. Did you speak English at the time you applied for admission to the United States?

A. I could not speak a single word of English.

Q. Then how did you complete this visa application? Were you assisted by anyone in the American Consulate who spoke German?

A. No, not to my knowledge. I can't remember.

Q. Mr. Kulle, do you dispute the information provided in your application for visa and in your immigrant Visa, which you have been shown here today?

A. Yes, the information is correct.

Q. Didn't you tell me that you lied to gain admission to the United States?

A. Yes, I said that.

Q. When and to whom did you lie?

A. I think I lied to the American Government. And I feel sorry, sorry about this.

There is not interview; I did not lie in an interview. Where I lied on the application for visa.

I have lied in the sense that I did not reveal that I was in the SS, and so forth.

Q. Are you saying that to the extent this document is inaccurate, this document, Exhibit 11?

A. Yes.

Q. Have you ever been interviewed by the Immigration and Naturalization Service of the United States Government?

A. No, never.

Kulle argues that he "lied" only in the sense that he did not reveal his membership in the SS, a piece of information not requested by the visa application. Kulle insists he never intended to conceal the fact of residence at Gross-Rosen. His marriage certificate, for example, attached to the visa application, shows that he was married at Gross-Rosen in August of 1944. Moreover, consulate officials did not hold a meeting to inquire about his wartime activities. Kulle suggests, therefore, he made reference to lying merely as a result of his incomplete understanding of English, his second language.

The government argues that the hearing demonstrates Kulle lied on his immigration papers by claiming that he had spent World War II in the German Army rather than the SS, because he believed his SS service would bar him from obtaining a visa. We agree. We also agree with the government that the misrepresentation concerned a "material" fact, Kulle's service at Gross-Rosen, insofar as it closed off a relevant line of inquiry which could designate him excludable. Ms. Geoghegan testified that service in the Waffen SS was a significant factor in the visa process. She claimed she would have denied an immigrant visa to any former SS member who had guarded concentration camp prisoners. We agree with the Board that Kulle's misrepresentation was "material." *See United States v.*

*One Lear Jet Aircraft*, 808 F.2d 765, 773 (11th Cir.1987) (area of "potential significance"); *Kungys v. United States*, 793 F.2d 516 (3d Cir.1986) (Certiorari granted to explore "material" under 8 U.S.C. § 1451(a)).

For the reasons discussed above, the decision of the Board of Immigration Appeals is affirmed.

AFFIRMED.