UNITED STATES of America, Plaintiff,

v.

Sergis HUTYRCZYK, Defendant.

Civ. A. No. 90–3184.

United States District Court,
D. New Jersey.

Oct. 2, 1992.

Denise Noonan Slavin, Asst. U.S. Atty., Office of Special Investigations, U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Joseph J. Benedict, Benedict and Altman, New Brunswick, N.J., for defendant.

## OPINION

HAROLD A. ACKERMAN, District Judge.

In this matter, the United States ("the Government") is attempting to denaturalize defendant Sergis Hutyrczyk ("Hutyrczyk"), because his naturalization allegedly was procured in violation of the Displaced Persons Act. While the Government brought several counts against Hutyrczyk, it seeks with this motion summary judgment on Count I only. That Count alleges that since Hutyrczyk assisted in the enemy's persecution of civilians during World War II, his naturalization was illegally procured and must be revoked.

After carefully reviewing the entire record in this case, as well as the oral arguments of July 27, 1992, and after recognizing and reflecting on the grave nature of the act of denaturalization, I nonetheless have concluded that as a matter of law, the Government is entitled to summary judgment on Count I of its Complaint.

*I. Standard of Review for Summary Judgment*

Summary judgment may be granted only if the pleadings, supporting papers, affidavits, and admissions on file, when viewed with all inferences in favor of the nonmoving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. See *Todaro v. Bowman,* 872 F.2d 43, 46 (3rd Cir.1989); *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3rd Cir.), *cert. dism'd,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). Put differently, "summary judgment may be granted if the movant shows that there exists no genuine issues of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hospital,* 843 F.2d 139, 143 (3rd Cir.1988), *cert. denied,* 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988). An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. See *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A fact is material if it influences the outcome under the governing law. *Id.* at 248, 106 S.Ct. at 2510.

■ Within the framework set out above, the moving party essentially bears two burdens: First, there is the burden of production, of making a prima facie showing that it is entitled to summary judgment. This burden may be met either by demonstrating there is no genuine issue of fact and that as a matter of law, the moving party must prevail or by demonstrating the nonmoving party has not shown facts relating to an essential element of the issue for which it bears the burden. Once either showing is made, this burden shifts to the nonmoving party who must demonstrate facts supporting each element for which it bears the burden as well as establish the existence of genuine issues of material fact. Second, there is the burden of persuasion. This burden is a stringent one which always remains with the moving party. If there remains any doubt as to whether a trial is necessary, summary judgment should not be granted. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 330–33, 106 S.Ct. 2548, 2556–58, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157–61, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); Advisory Committee's Notes on Fed.Rule of Civ.Proc. 56(e), 1963 Amendment; see generally C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2727 (2nd ed. 1983).

In light of this standard, the following factual chronology is taken from defendant's own testimony and the undisputed and uncontradicted statements of others.

## II. Background

Sergis Hutyrczyk was born on March 3, 1924 [1] in Ucios, a village in Poland that later became known as Byelorussia and now is part of the Republic of Belarus. In about June 1941, the area was invaded by Germany. That same month, Mayor Hunko of Ucios conscripted five young men, including Hutyrczyk, to form a self-defense unit for the Borough.[2] The group wore civilian clothes and patrolled the village at night.[3]

After serving in two other posts, defendant and thirteen other men were chosen at random and taken to an estate at Koldyczewo in June or July of 1942.[4] This proceeding revolves around the state of the camp and Hutyrczyk's role at the camp [5] during the time period that he served there.

## A. The Camp at Koldyczewo

The camp at Koldyczewo was started by the Germans in early-to-mid 1942 [6] to serve as a forced labor site and later, an execution site and concentration camp.[7] About two weeks after defendant's arrival at the camp, about 100 Jews were sent to the camp by the Germans [8], ostensibly to perform such professional tasks as tailoring and shoemaking. The Jews were visibly identifiable and distinguishable from other prisoners because they wore a yellow Star of David on their clothing [9] and were housed in separate barracks—a barn.[10] According to the uncontradicted and undisputed testimony of another guard at the camp, there was no floor in the barn—only dirt—and at night the barn was locked and the prisoners were not allowed to leave.[11]

1. Actually, official documents often list Hutyrczyk's birthdate as 1922. However, as he says in his deposition, the birthdate was apparently changed from 1924 to 1922 so that he could attend a certain school in 1938.

2. See Affidavit of Sergis Hutyrczyk, June 12, 1992 (hereinafter Hutyrczyk Affidavit I) at 2–3.

3. *Id.*

4. *Id.*

5. The word "camp" in this opinion is used simply as a description of the estate at Koldyczewo. By itself, without any further analysis, the word is not meant to connote anything graver.

6. In his expert testimony, Professor Raul Hilberg states that the first prisoners arrived in March, 1942. This is contested by defendant, who notes that other statements in the case state that the first prisoners arrived in July. Once again, for purposes of this summary judgment motion, the defendant's version of the facts must be accepted as true. And, keeping that in mind, it is undisputed that prisoners were at the camp during defendant's tenure.

It should be noted that defendant objects generally to several parts of Professor Hilberg's Affidavit (hereinafter *Hilberg* Affidavit), contending that Professor Hilberg selectively quotes from various parts of the record and ignores other parts of the record contradicting the quotes. Without taking a position on defendant's contention, this Court nonetheless refrains from citing Professor Hilberg's affidavit except for general historical expertise.

7. Many statements in the record testify to the atrocious conditions of the camp after November 1942. Defendant concedes as much when he argues that "[a]rmed with fifty years of hindsight, Plaintiff is attempting to shoehorn defen-

dant into a setting which did not exist at Koldyczewo at the time defendant was there, but only developed some months later." *Defendant's Memorandum in Response to Plaintiff's Reply Memorandum in Support of Plaintiff's Motion for Summary Judgment on Count One*, at 3.

8. See Plaintiff's *Exhibit 2.3, Transcript of October 11, 1990 Deposition of Sergis Hutyrczyk (hereinafter "Hutyrczyk Deposition")* at 72.

9. Defendant's deposition reads, on this point:

Q: You described this as a group of approximately 100 Jews who were specialists.
A: Approximately, yes.
Q: How did you know they were Jews?
A: Well, because they carried the David star on their front, on their clothes.
*Hutyrczyk Deposition* at 80.

10. Defendant's deposition reads:

Q: Where did [the Jews] live at Koldyczewo?
A: Those people?
Q: Yes.
A: These people live in barn.
Q: In the barn?
A: In the barn.
*Hutyrczyk Deposition* at 80.

11. Defendant asserts in his deposition that he did not "know anything about [the Jews'] living conditions in the barn". *Hutyrczyk Deposition* at 79. Thus, the facts about conditions in the barn are drawn from uncontradicted statements by a prisoner at the camp and another guard at the camp. For these statements, see *Plaintiff's Exhibit 3.1, Transcript of July 30 Deposition of Boris Drozd (hereinafter "Drozd Deposition")* at 53:

Q: What was the prisoners' barracks made out of?

At night, guards patrolled the perimeter of the camp to guard against partisan attacks and to ensure that no prisoner, including the Jews, left the camp.[12] During the day, Jews were generally not allowed to leave the camp to go to the nearby village. Occasionally, however, they could obtain a special permit to go to the village to buy food[13]. Food rations were meager,[14] labor was forced,[15] and lengthy.[16] The Jews were, in every sense of the description, prisoners[17] solely because of their religion.[18]

### B. Hutyrczyk's duties at the Camp

As part of their effort to implement the "Final Solution," the Germans depended on assistance from the local populations that they occupied.[19] For instance, the camp at Koldyczewo was run by local Byelorussians.[20]

During June or July of 1942, Hutyrczyk was one of 14 Byelorussian men taken by

A: Wood.
Q: And was that structure there when you came in July of 1942?
A: Yes. It was an old structure.
Q: Do you know what the floors were made of in the prisoners' barracks?
A: There was none.
Q: There was no floor?
A: No.
Q: So was there just dirt on the floor?
A: Yes.
Q: And the guards' barracks ... [W]as there a floor in the guards' barracks?
A: Yes.

    *     *     *     *     *     *

Q: Was their barracks locked from the outside?
A: Yes.
*Id.* at 140.

    *     *     *     *     *     *

Q: Were they allowed to leave the barracks at night?
A: No.
*Id.* at 43.

12. Hutyrczyk states that there was a curfew in effect against all people at the camp, including guards who were not on duty. See *Hutyrczyk Affidavit I* at 5 ("At night I guarded the perimeter of the camp against attacks by partisans. When I was on guard duty at night I was supposed to stop anyone who was violating the curfew....")

13. See *Hutyrczyk Deposition* at 82.

Defendant also appears to acknowledge that Jews were generally not allowed to leave the camp:
Q: Okay. So to your knowledge, those 100 Jewish people who came to work at Koldyczewo they did not leave during the time that you were there?
A: No. Not leave Koldyczewo.
Q: They did not leave Koldyczewo?
A: No. They stayed in Koldyczewo.
See also *Drozd Deposition* at 65 (stating that prisoners were guarded at all times) and *Drozd Deposition* at 140 (Jews' barracks were locked from the outside.)

14. See the *Plaintiff's Exhibit 3.3, October 29, 1991 Deposition of Chanan Peleg*, a prisoner at Koldyczewo, who arrived there in August of 1942:
Q: What kind of food did the prisoners get to eat when you first came?
A: What food? What food? I don't know. I ate grass from the trees. I took food from the pigs. The police let me go in. They saw me.... I was hungry.
*Id.* at 15. This testimony is uncontradicted, in that Hutyrczyk professes no knowledge of how the Jews were treated.

15. Hutyrczyk states that he did not know if the Jews were paid or not. See *Hutyrczyk Deposition* at 74. However, he also indicated that the Jews were prisoners, as did the testimony of Boris Drozd, another guard at the camp. Moreover, the testimony of a prisoner at the camp shows that the labor was forced. See *Plaintiff's Exhibit 3.2, October 28, 1991 Deposition of Mayer Lazowski* at 12.

16. See *Hutyrczyk Deposition* at 74 (Jews worked from early morning until evening.)

17. The transcript of defendant's deposition reads, on this point:
Q: When you were at Koldyczewo in July, 1942 through October, 1942, was there any kind of fence or anything around the estate?
A: No.
Q: Was there any prison there?
A: There was, after we were two weeks, around the main building we bring about 100, Jewish people that was all specialists, professional. And tellers [tailors], schusters [shoemakers] and other professionals.
*Hutyrczyk Deposition* at 72. This response clearly acknowledges that the Jews were prisoners.

18. See *Drozd Deposition* at 57 (the Jewish prisoners "did not commit any kind of crime.")

19. See *Hilberg Affidavit* at 9–10.

20. Defendant was a Byelorussian; prisoners at the camp describe many of the guards' nationality as Byelorussian.

the Germans to Koldyczewo to serve in various functions.[21] While he claims to have been unaware of any German control of the camp, his deposition transcript indicates the opposite.[22] The persons in charge of the camp were Byelorussians named Levusz and Bobko, the latter being known for his cruelty.[23] While stationed at Koldyczewo, Hutyrczyk wore a uniform[24] and carried a rifle.[25] He was paid for his work and on occasion allowed to leave the camp.[26]

Hutyrczyk's duties were twofold. First, it was his responsibility to train recruits.[27] Periodically, a group of Byelorussian recruits would arrive at the camp for three to four week stints of training, which defendant and other guards supervised.[28] After training was completed, the newly trained regiment would be sent to Minsk, to serve in Byelorussian battalions set up by the Germans.[29]

Along with training the recruits, Hutyrczyk also served as a guard. He would guard the perimeter of the camp at night until 8:00 in the morning, see *Hutyrczyk Deposition* at 77. His duties involved guarding against partisan attacks as well as enforcing a curfew that was in effect after 8:00 in the evening. If, while defendant was patrolling the perimeter of the camp at night, he saw someone attempting to leave the camp, he was to "stop the person and ask, request what to do, and on. A little bit investigate." *Hutyrczyk Deposition* at 81. His duties after stopping someone can best be understood by quoting from his deposition transcript:

Q: So if one of the Jews was trying to leave, and you would stop them and say what are you doing, where are you going?

A: Yes. If I am in duty, on the perimeter, I must stop them because you don't know who is who.

Q: Then after you investigated, what were you supposed to do?

A: But this is not happens.

Q: This did not happen?

A: Did not happen. Because curfew is curfew, nobody want to break up the law. This is war time. If you break law, you know what happens.

Q: What would happen?

A: Well, put you in jail or something.

---

**21.** See *Hutyrczyk Deposition* at 62.

**22.** First, Hutyrczyk testifies that the Germans recruited 14 men to serve at Koldyczewo. *Hutyrczyk Deposition* at 62. Second, regarding Koldyczewo itself, his deposition reads as follows:

Q: Did the Germans send any people there to be trained?
A: I no see any German there.
Q: Did you get any orders from any Germans?
A: I think maybe they have order from the Germans but so far we have any order, I heard nothing. I have my order from Levusz. That is all I know. And I follow his order. *Hutyrczyk Deposition* at 68.
See also *Drozd Deposition* at 36 (stating that the Chief of the Camp was a German).

**23.** "[Bobko] was a brutal man—[Hutyrczyk] claims that Bobko beat the Byelorussian guards at Koldyczewo and may have beaten the Jewish workers as well." See *summary of an OSI investigator's interview of Hutyrczyk of April 12, 1989, submitted by defendant in opposition to plaintiff's motion and attached as Exhibit E to the Supplemental Affidavit of Sergis Hutyrczyk (hereinafter "Exhibit E")* at 2.

**24.** The guards wore German army uniforms *Drozd Deposition* at 19. See also *Hutyrczyk Deposition* at 88, 89 (saying that new uniforms were issued in August, 1942.) See also *Exhibit E* ("[Hutyrczyk] claims he wore a dark green uniform at Koldyczewo....")

**25.** See *Exhibit E* ("[Hutyrczyk] was sent to Koldyczewo [where he] carried a rifle.")

**26.** Regarding the guards' pay, see the uncontradicted testimony of Drozd, in *Drozd Deposition* at 66. (Guards were paid monthly for their services). See also *Defendant's Statement of Material Facts as to Which Genuine Issues Do Exist* at 12 (admitting that Defendant began to wear a uniform and receive a salary upon his transfer to Baranowicze, which occurred *prior* to his stint at Koldyczewo). Regarding guards leaving the camp, see *Drozd Deposition* at 69 (Guards received 10 days vacation per year). See also *Exhibit E* (stating that Hutyrczyk occasionally sent guards to a nearby town for food, and sometimes accompanied them.)

**27.** See *Hutyrczyk Affidavit* at 4.

**28.** *Id.*

**29.** *Id.*

Q: Is that what your orders were, to arrest someone?

A: No. No. We have no orders.

*Hutyrczyk Deposition* at 81.

Defendant allegedly was transferred out of Koldyczewo on October 31 or November 1, 1942. The parties seem to agree that in the years following that time, Koldyczewo became a camp enclosed by barbed wire [30], a place for Germans to implement their policies of torture and execution of Jews.[31] However, the time frame at issue in this motion is between June and November, 1942, and all evidence of the camp after this time must be disregarded.

### C. After Koldyczewo

Hutyrczyk's wartime activities following his stint at Koldyczewo are in dispute, and are not relevant to this motion.

At any rate, after the war, Hutyrczyk went with his wife to Germany and contemplated immigrating to Canada. Instead, he went to France, where he began to consider applying for visa to go to America. In July of 1951, he obtained a determination from the International Refugee Organization ("IRO") in Paris, France that he was a refugee under its mandate. Two years later, he obtained an "Application for Immigrant Visa and Alien Registration" from the American Embassy in Paris, and claimed eligibility under the recently enacted Displaced Persons Act. After his application was accepted, he immigrated to New York on January 3, 1954.

In August, 1960, filed with the Immigration and Naturalization Service ("INS") a "Statement of Facts for Preparation of Petition" and an "Application to File Petition for Naturalization". On March 7, 1961, the County Court of Middlesex County in New Brunswick, New Jersey granted Hutyrczyk's "Petition for Naturalization", and Hutyrczyk became an American citizen.

In 1990, the United States filed a six-count complaint against Hutyrczyk, seeking his denaturalization because his citizenship was illegally procured. Count I alleges that Hutyrczyk advocated or assisted in the persecution of individuals because of race, religion, or national origin, in violation of Section 13 of the Displaced Persons Act; Count II contends that Hutyrczyk acquiesced in activities or conduct contrary to civilization and human decency, in violation of various State and Justice Department regulations; Count III alleges that Hutyrczyk misrepresented material facts for the purpose of gaining admission to the United States; Count IV alleges that Defendant lacked good moral character as a result of his wartime persecutory conduct; Count V alleges that Hutyrczyk repeatedly gave false testimony for the purposes of gaining immigration benefits; and Count VI alleges that he procured his citizenship by concealing material facts or willfully misrepresented material facts.

The government now moves for summary judgment on Count I only. Oral argument was held on July 27, 1992, after which I reserved decision on the matter. I now turn to the merits of the Government's argument.

### III. Discussion

■ Few rights are as symbolically important in our democratic country as the right to acquire and keep American citizenship. Once acquired, the loss of citizenship can have "severe and unsettling consequences." *Fedorenko v. United States*, 449 U.S. 490, 505, 101 S.Ct. 737, 746, 66 L.Ed.2d 686 (1981). Thus, the Supreme Court has held repeatedly that the Government "carries a heavy burden of proof in a proceeding to divest a naturalized citizen of his citizenship," *Costello v. United States*, 365 U.S. 265, 269, 81 S.Ct. 534, 536, 5 L.Ed.2d 551 (1961). When such a proceeding is begun, the evidence justifying denaturalization must be "clear, unequivocal, and convincing" and must not leave "the issue in doubt." *Fedorenko*, 449 U.S. at 505, 101 S.Ct. at 747 (citing *Schneiderman*

---

**30.** See *Hutyrczyk Affidavit* at 4 (when defendant visited Koldyczewo in 1943, he saw barbed wire at the camp.)

**31.** See *Drozd Deposition* at 77–78 (graphically describing brutal treatment and executions accorded Jews attempting to escape.)

*v. United States*, 320 U.S. 118, 122, 63 S.Ct. 1333, 1335, 87 L.Ed. 1796 (1943)).

■ Despite the precious nature of the right and the government's concomitant heavy burden for divesting someone of the right, the jurisprudence in this area makes clear that in order to gain citizenship, "there must be strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship." *Fedorenko*, 449 U.S. at 506, 101 S.Ct. at 747. If at any time it is found that any of these statutory requirements were not complied with, the certificate of citizenship must be held to have been "illegally procured." *Id.* Once held to be illegally procured, naturalization must be set aside. A court may not look to equitable considerations—such as that a petitioner led an uneventful life for several decades in this country—to deny a request for denaturalization. *Fedorenko* at 517, 101 S.Ct. at 752 ("[D]istrict courts lack equitable discretion to refrain from entering a judgment of denaturalization against a naturalized citizen whose citizenship was procured illegally...").

The relevant statute in this case is the Displaced Persons Act of 1948, Pub.L. No. 80–774, 62 Stat. 1009, amended by Pub.L. No. 81–555, 64 Stat. 219 (1950) (hereinafter "DPA"), under which Hutyrczyk entered the country, and subsequently became naturalized. The DPA was passed in 1948 to temporarily eliminate restrictive immigration quotas by permitting entrance to the United States of vast numbers of persons displaced by World War II. Originally, the Act expressly prohibited issuance of a visa "to any person who is or has been a member of, or participated in, any movement which is or has been hostile to the United States or the form of government of the United States." DPA § 13, Pub.L. No. 80–774, ch. 647, 62 Stat. 1009, 1014 (1948). The DPA also limited its application to individuals "who [were] the concern of the IRO under the IRO's constitution." Those not of concern to the IRO were described in the IRO Constitution as:

2. Any other persons who can be shown:

(a) to have assisted the enemy in persecuting civil populations of countries, Members of the United Nations; or

(b) to have voluntarily assisted the enemy forces since the outbreak of the Second World War in their operations against the United Nations.

IRO Constitution, Chapter XXIX, annex I, part II, § 2(a) & (b) (footnote omitted.) In 1950, Congress amended Section 13 of the DPA to prohibit issuance of a visa to any person who "advocated or assisted in the persecution of any person because of race, religion, or national origin...." June 16, 1950 Amendment to DPA, Pub.L. No. 81–555, ch. 262, 64 Stat. 219, 227 (1950) ("Section 13").

In this motion, the Government relies on Section 13.

Over a decade ago, the United States Supreme Court directly addressed the situation at issue in this case. Writing for the Court in *Fedorenko v. United States*, 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981), Justice Marshall discussed the DPA in the context of an individual who admitted being a guard at the notorious Treblinka concentration camp but who claimed that he did so under threat of death and never persecuted any particular individual. The Court looked both to the language of the statute itself and then to the trial testimony of Kempton Jenkins, a career foreign service officer who served in Germany after the war as one of the vice consuls in charge of administering the DPA. In so doing, the Court found that "the plain language of the statute and Jenkins' uncontradicted and unequivocal testimony leave no room for doubt that if petitioner had disclosed the fact that he had been an armed guard at Treblinka, he would have been found ineligible for a visa under the DPA." *Id.* at 513, 101 S.Ct. at 750. Articulating the general proposition, the Court held that the statute created an objective standard that essentially ignores the individual's state of mind:

Because we are unable to find any basis for an "involuntary assistance" exception in the language of § 2(a) [of the DPA], we conclude that ... [t]he plain language

of the Act mandates precisely the literal interpretation that ... an individual's service as a concentration camp armed guard—whether voluntary or involuntary—made him ineligible for a visa.

See also *United States v. Schmidt*, 923 F.2d 1253, 1258 n. 8 (7th Cir.1991) ("Schmidt's actual knowledge of the events occurring inside the walls of Sachsenhausen is unnecessary to a conclusion that he assisted in persecuting its inhabitants"). Thus, although the petitioner in *Fedorenko* claimed to have been enlisted against his will and over threats of death, the Court held that his naturalization was properly revoked.

But lest the reader of the decision be left with the impression that the statute created a strict liability standard, the Court provided an explanatory footnote, meant in large part to provide a mechanism to distinguish acts of persecution by prisoners from acts of persecution by the occupying forces. In the footnote, Justice Marshall seemed to limit "concentration camp armed guard" to guards with particular characteristics:

> The solution ... lies not in "interpreting" the Act to include a voluntariness requirement that the statute itself does not impose, but in focusing on whether particular conduct can be considered assisting in the *persecution* of civilians. Thus, an individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. On the other hand there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend, and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders from the commandant of the camp, fits within the statutory language about persons who assisted in the persecution of civilians. Other cases may present more difficult line-drawing problems but we need decide only this case.

*Id.*, 449 U.S. at 512–13 n. 34, 101 S.Ct. at 750 n. 34.

In other words, by holding that an armed guard at a Nazi concentration camp can automatically be denaturalized, the Court was referring to a guard "who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend, and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates...." Implicit in the decision, particularly in the footnote cited above, is that if the defendant's activities do not fall into that egregious category, some line-drawing is necessary to determine if the individual "assisted in persecution."

In this case, the government contends that Hutyrczyk was automatically ineligible for a visa because "[d]efendant's guard service at Koldyczewo meets all the indicia of Nazi camp guard service outlined in *Fedorenko*." Specifically, the government argues that

> Like Fedorenko, Defendant wore a uniform. Like Fedorenko, Defendant carried a rifle and ammunition. Like Fedorenko, Defendant was paid a salary. No difficult line-drawing is needed to determine that Defendant, like Fedorenko, assisted in persecution proscribed by the DPA.

Peculiarly, though, in drawing its analogy between Hutyrczyk and Fedorenko, the Government leaves out Fedorenko's most egregious characteristic: he admitted to shooting at escaping inmates. Furthermore, it is far from self-evident from the moving papers and exhibits that during the summer and fall of 1942, the estate of Koldyczewo was sufficiently analogous to Treblinka that this matter can be decided summarily by declaring Koldyczewo a concentration camp that inevitably was a site of persecution. Therefore, I must engage in some "line drawing" by analyzing two issues: whether during defendant's tenure, Koldyczewo was a site where persecution of Jews or other civilians occurred; and second, whether defendant's activities constituted "assisting persecution." I turn to these issues in turn.

## A. The Camp at Koldyczewo

■ Fedorenko held only that a Nazi concentration camp inevitably was a site of persecution. While the conditions at Koldyczewo were atrocious, during defendant's stay they did not reach the level of the camp at issue in Fedorenko; in fact, defendant contends that no camp existed while he was at Koldyczewo. The clear import of the case law in this area of law, including *Fedorenko*, however, shows that in order to be a persecutory site, a camp need not involve such barbarous acts as mass executions or even sporadic shootings. Rather, persecution comes in many forms, mental as well physical. Addressing a situation directly pertinent to this case, one Court has noted that there is "nothing significant to distinguish armed guard service at a labor camp from such service at a concentration camp." *United States v. Kairys*, 782 F.2d 1374, 1378 (7th Cir.1986). As the Seventh Circuit has put it:

> [I]ncarcerations, forced labor, cruel and inhuman treatment, and arbitrary and severe punishment are sufficient to rise to the level of persecution.... We need only recall the Nazis' decree that Jews, Gypsies, Russians, Ukrainians and Poles must suffer "extermination through work." Once the fact of forced labor is established, the remaining proof is routinely satisfied. It seems clear to us that the tagging of prisoners along racial, national, or religious lines creates a strong presumption of persecution because of race, religion, national origin or political opinion.

*Kulle v. I.N.S.*, 825 F.2d 1188, 1193 (7th Cir.1987).

As detailed above, there is much uncontradicted evidence in the record which indicates that during the time that defendant admits to being a guard at Koldyczewo, acts that can only be described as causing mental anguish, fear and humiliation—all indicia of persecution—occurred at Koldyczewo.[32] The camp served as a prison for Jews, who were forced to identify themselves as Jewish by wearing yellow stars of David on their clothing, were housed in a locked barn without a floor, and were unable to leave the camp except, perhaps, for brief supervised trips to the village for food. While defendant was there during the summer of 1942, about 100 Jews were imprisoned and forced to work at their trades from morning to evening. Thus, without finding that all labor camps necessarily constitute sites of persecution, I find that during the time period at issue in this case, the undisputed facts disclose that Koldyczewo, as a matter of law, constituted a persecutory setting within the meaning of the DPA. Thus, if defendant assisted in the persecution taking place at the camp, the government is entitled to denaturalize him.

## B. Defendant's activities

■ While defendant cannot be considered an armed concentration camp guard under Fedorenko, it seems clear, from the policies and case law in this area, that defendant's activities were clearly closer to Fedorenko's than to the person who cuts a prisoner's hair before the prisoner is to be executed.[33] It is uncontradicted from the record that Hutyrczyk carried a rifle, wore a uniform issued by the Germans, received a stipend, was allowed to leave the camp, and patrolled the perimeter of the camp to enforce a curfew that resulted in Jewish prisoners remaining at the camp to be persecuted both physically and mentally. While Hutyrczyk does not explicitly say that he was under orders to shoot escaping inmates, his testimony quoted above clearly exhibits an awareness of the grave treatment accorded potential escapees.[34]

---

**32.** Hutyrczyk explicitly denies any knowledge of how the Jews were treated, and, as noted in the text, there is overwhelming clear and convincing evidence to support the view that the Jews were being persecuted during defendant's tenure at Koldyczewo.

**33.** The government contends, as does its expert witness, that the unit at Koldyczewo of which defendant was a part, was called the Schutzmannschaft. Defendant claims no knowledge of this term, and I see no reason to resolve this fact.

**34.** See *Hutyrczyk Deposition* excerpt quoted in the text of this Opinion on page 11, supra.

Moreover, courts have repeatedly held that personal involvement in persecution is unnecessary to a finding that citizenship was illegally procured under the DPA. See *United States v. Kairys,* 782 F.2d 1374, 1377 n. 3 (7th Cir.1986) ("service as Nazi concentration camp guard equaled persecution of civilians for purposes of the DPA without proof of personal involvement in the atrocities, and the outcome here must be the same because service in a Nazi labor camp was similar to service in a Nazi concentration camp.") (citations omitted). In another case, a United States District Court persuasively reasoned that there exists an inevitably persecutory relationship between the armed representatives of the occupying forces and the unarmed prisoners forced to fear every armed presence:

> The mere presence of the watchful eye of the conqueror or his deputies, coupled with the often demonstrated presence of both the means and the inclination to persistently inflict various indignities ... is the personification of mental persecution to anyone, let alone innocent civilian[s] ... reduced to various degrees of substandard mental and physical well-being.

*United States v. Osidach,* 513 F.Supp. 51, 90 (E.D.Pa.1981), appeal dismissed on defendant's death, No. 81–1956 (3d Cir. July 22, 1981). At Koldyczewo during the summer and fall of 1942, Hutyrczyk was an armed representative of the occupying force that had imprisoned Jews simply because they were Jews and had persecuted them.[35] Without individuals guarding the perimeter of the camp at night, ensuring that no Jew escaped, the cruel treatment would not have been able to continue. De-

fendant's work, then, does seem to have been assisting persecution.[36]

Hutyrczyk nevertheless makes a number of arguments why summary judgment should not be granted.

First, defendant argues that he never actually had to stop anyone while on duty patrolling the perimeter of the camp. This argument is dispositive of nothing, however, because the effect of the presence of armed guards surely must have persuaded prisoners not to attempt to leave their barracks, thereby keeping the Jews imprisoned because of their religion.

Second, defendant contends that he did not directly participate in any activities concerning Jews at the camp. But one does not have to directly torture an individual to be held as assisting persecution. In this case, defendant admits to patrolling the perimeter of the camp to ensure that Jews and others did not escape. This is certainly assisting in keeping Jews confined at a forced labor camp.

Third, defendant argues that under the INS's implementation of the Constitution of the IRO, membership in a German-controlled unit raised only a rebuttable presumption that the individual assisted in persecution. For example, defendant cites a Third Circuit case that quoted testimony of A.P. Conan, a senior DPC officer, to the effect that "an applicant who had served in the Ukrainian Schutzmannschaft would have been rejected unless he overcame the presumption against his eligibility by showing that his service was involuntary, and that he had not committed atrocities or persecuted any person on the ground of religion, race, or national origin." *United*

---

**35.** Dissenting in *Fedorenko,* Justice Stevens wrote:

> The Court [concludes] that prisoners who did no more than cut the hair of female inmates before they were executed could not be considered to be assisting the enemy in *persecuting* civilians populations. Thus the Court would give the word "persecution" some not yet defined specially limited reading. In my opinion, the term "persecution" clearly applies to such conduct; indeed, it probably encompasses almost every aspect of life or death in a concentration camp.

*Fedorenko,* 449 U.S. at 534, 101 S.Ct. at 761 (Stevens, J., dissenting) (emphasis in original).

**36.** It should also be noted that the act of training recruits, which defendant contends was his main duties, may also be considered persecution under the DPA. At defendant's admission, the recruits, when finished at Koldyczewo, were sent to Minsk. At Minsk, the Commander of the Security Police and SD was forming a battalion of volunteer soldiers. See Hilberg Affidavit at 24.

*States v. Kowalchuk*, 773 F.2d 488, 494 (3d Cir.1985). But whatever the practice of the DPC officers during interviews for granting visas, the Supreme Court has clearly held that the DPA does not contain an "involuntary assistance" exception. Thus, this argument is best taken to Congress, for the Courts are constrained by the Supreme Court's interpretation of the DPA.

Fourth, Hutyrczyk cites to a 6th Circuit case interpreting the Holtzman Amendment, a piece of legislation similar to the provisions of the DPA at issue in this case, passed in 1978 and providing for the deportation of aliens who participated in Nazi-directed persecution of individuals because of race, religion, national origin or political opinion. *Petkiewytsch v. INS*, 945 F.2d 871, 876 (6th Cir.1991). In that case, the Court of Appeals held that an individual forced to work as a civilian labor guard under threat of imprisonment or execution, who served reluctantly and at a young age, and who had not engaged in any persecution of a particular person, could not be deported under the Holtzman amendment. In its analysis, the Sixth Circuit distinguished *Fedorenko*:

> In [Footnote 34 of *Fedorenko*], the Supreme Court stated that the proper focus of a court faced with the problem of limiting the DPA's exclusionary language only to those whom Congress intended to exclude should be upon "whether particular conduct can be considered assisting in the *persecution* of civilians." .... Obviously, Fedorenko's most egregious conduct was shooting at escaping inmates. The petitioner in the present case, Petkiewytsch did not ever fire his rifle or otherwise abuse or attempt to injure an inmate.

*Petkiewytsch* at 880. However, the Sixth Circuit quoted this language largely to support its argument that to be deported under the Holtzman Amendment, an individual's conduct must truly be egregious: "If as the Supreme Court stated, the focus under the DPA should be on the 'particular conduct' of the immigrant, then given the legislative history of the Holtzman Amendment, that focus should be even more searching under [the Holtzman Amendment]." *Petkiewytsch* at 880. And unlike the limited amount of legislative history under the DPA, the Court of Appeals found much evidence from legislative history of the Holtzman Amendment to point to its policy of deporting Nazi war criminals who deliberately persecuted civilians. For example, the Court found innumerable statements to the effect that the amendment was "intended to deny 'sanctuary' in the United States to Nazi *war criminals*'" *Petkiewytsch* at 879 (quoting 124 Cong. Rec. 31,647 (1978) (statement of Rep. Holtzman) (emphasis in original).[37]

The standard simply is not so stringent under the DPA. Voluntariness does not matter, nor does active assistance in the persecution. Furthering the goals of forced slave labor, maltreatment of civilian prisoners because of religion, and guarding with orders to prevent prisoners from escaping are enough to constitute persecution under the DPA.

Finally, defendant's attorney made an impassioned plea during oral argument to consider that this case comes before the Court fifty years after the facts at issue, and implores the Court to keep the time frame at issue separate from today's general knowledge of the Nazi regime. Specifically, Joseph Benedict, defendant's attorney said:

> I'm just thinking back to my days when I was in Viet Nam. I visited some client

---

**37.** Other statements that the Court found in the legislative history included:
—"[the] bill applies to any person who committed war crimes under the Nazis";
—"The bill as reported here contains an amendment that limits the language of the bill solely to those persons engaged in war crimes"
—"The bill is intended to cover active participation and not mere acquiescence by the population as a whole;

—"The purpose of this bill ... is to prevent the entry into, as well as facilitate the deportation from, the United States of aliens who have engaged in persecution based on race, religion, national origin or political opinion under the Nazis."
*Petkiewytsch* at 879.

at Lon Bin Jail. And that was clearly a—it was a military camp, and within the camp there was a jail. Men who'd been out on patrol would sometimes come back to the rear area at Lon Bin, and while they were back in the rear area they would occasionally pull guard duty. And if they're on the perimeter, what, if anything, is the relationship to the people who are imprisoned in that jail?

*Transcript of Proceedings, July 27, 1992*

This case is significantly different than Mr. Benedict's analogy, however. Here, 100 Jews were imprisoned for no reason other than their religion, were identifiable by the Star of David on their clothing, were forced to remain at the camp, housed in a barn without a floor. Once it is found that the camp constituted a persecutory setting, Hutyrczyk's role as an armed enforcer of a curfew while patrolling the perimeter of the camp is sufficient to categorize his activities as assisting persecution.

Thus, in finding clear and convincing evidence that Hutyrcyk was excludable under the Displaced Persons Act, I am compelled to grant the government's motion.

## CONCLUSION

I can only repeat that I am acutely aware of the stakes involved in this case—the possibility of the deportation of an individual who has lived an uneventful life in this country for nearly forty years. But the issue in this motion is what happened fifty years ago halfway across the world. And after carefully considering the entire record, the oral arguments, the grave nature of the proceeding, and the controlling law, I am left with the conclusion that the Government's motion for Summary Judgment pursuant to Fed.R.Civ.P. 56(a) must be granted as to Count I of its Complaint.